337 F.3d 237
 Marshall MANLEY, Plaintiff-Counter-Defendant-Appellant,
v.
AMBASE CORPORATION (formerly known as The Home Group, Inc.), Defendant-Counter-Claimant-Appellee.
 Docket No. 02-7032.
 United States Court of Appeals, Second Circuit.
 Argued: January 23, 2003.
 Decided: July 28, 2003.
 
 COPYRIGHT MATERIAL OMITTED William Simon, McCullough, Goldberger & Staudt, LLP, White Plains, New York (Anne De Sutter, on the brief), for Plaintiff-Counter-Defendant-Appellant.
 Mark R. Kravitz, Wiggin & Dana LLP, New Haven, Connecticut (Jonathan M. Freiman, on the brief) and Philip Halpern, Collier, Halpern, Newberg, Nolletti & Bock, LLP, White Plains, New York, for Defendant-Counter-Claimant-Appellee.
 Before: NEWMAN, KATZMANN, and RAGGI, Circuit Judges.
 RAGGI, Circuit Judge.
 
 
 1
 Appellant Marshall Manley sued his former employer, appellee AmBase Corporation, for breach of contract in connection with AmBase's failure to indemnify Manley for $2.43 million paid to settle claims by the bankrupt estate of Finley, Kumble, Wagner, Heine & Underberg ("Finley Kumble"), formerly one of the nation's largest law firms. This case was tried twice as a result of a ruling by the United States District Court for the Southern District of New York (Robert J. Ward, Judge) after the first trial that a jury verdict in favor of Manley was against the weight of the evidence. See Manley v. AmBase Corp., 121 F.Supp.2d 758, 764-71 (S.D.N.Y.2000): Now appealing from the December 3, 2001 final judgment entered in favor of AmBase after the second trial, Manley asserts that the district court erred in four respects: (1) by setting aside the initial jury verdict in his favor and ordering a new trial; (2) by refusing to allow Manley to offer into evidence at the second trial statements made by former AmBase chairman, George Scharffenberger, at a discovery deposition; (3) by giving an erroneous limiting instruction regarding certain documentary evidence at the second trial; and (4) by denying his motion for a new trial on the ground that the second jury had been tainted by contact between a court employee and a deliberating juror.
 
 
 2
 Because we conclude that the district court's challenged actions were all within its discretion, we affirm.
 
 I. Background
 A. Manley's Relationship with Finley Kumble
 
 3
 Marshall Manley had practiced law for thirteen years and already served as a partner at two separate firms when, in 1978, he joined Finley Kumble to open its California office. A proficient "rainmaker," Manley accounted for substantial annual Finley Kumble billings — in excess of $14 million in 1984 — and he earned more than any other Finley Kumble partner, frequently over $1 million per year. He served as managing partner of the firm's California operations, co-managing partner of the entire firm, and a member of its management committee. For a time, the firm even bore his name: Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey.
 
 
 4
 In 1981, Manley incorporated a professional personal service corporation, Marshall Manley, P.C. ("Manley P.C."), of which he was the sole officer, director, shareholder, and employee. From 1982 forward, Manley P.C., not Manley individually, was a partner at Finley Kumble.
 
 B. Manley's Relationship with AmBase
 
 5
 Both before and after joining Finley Kumble, Manley performed legal work for City Investing Company, a conglomerate that owned Home Group, Inc., the predecessor to AmBase.[1] In 1984, in connection with a plan to liquidate City Investing, AmBase chairman George Scharffenberger recruited Manley to serve as president of AmBase, offering a starting annual salary of $350,000, a potential $187,500 bonus, and an interest-free loan to assist Manley in acquiring a New York residence. Although initially reluctant to move to New York or to take such a large pay cut, Manley eventually accepted Scharffenberger's offer and, on March 8, 1985, became president of AmBase.
 
 
 6
 One factor influencing Manley's decision was an understanding that he would continue to be compensated by Finley Kumble while running AmBase. At trial, Manley testified that he had been eager to serve his relationship with Finley Kumble but remained at Scharffenberger's request. Scharffenberger, on the other hand, insisted that it was Manley who asked to continue at Finley Kumble while working for AmBase. No matter where the idea originated, AmBase's corporate minutes document Scharffenberger's March 18, 1986 statement to the board's personnel committee that Manley was "a Senior Partner in one of the Country's largest law firms and that it was his [i.e., Scharffenberger's] desire to have Mr. Manley continue to serve in that role." Mar. 18, 1986 Personnel Comm. Minutes at 1.
 
 
 7
 C. Manley P.C. Withdraws as a Partner of Finley Kumble and Becomes "Of Counsel" to the Firm
 
 
 8
 In 1987, Finley Kumble increased Manley P.C.'s annual compensation to $1.5 million. Under the partnership agreement, this obligated Manley P.C. to make an additional capital contribution to the firm. Manley refused. He also refused to treat his AmBase compensation as partnership income or personally to guarantee Finley Kumble's obligations.[2] As a result of these disagreements, in August 1987, Manley P.C. resigned as a Finley Kumble partner and became "of counsel" to the firm.
 
 
 9
 Scharffenberger reported these changed circumstances to the AmBase personnel committee, and, in December 1987, AmBase increased Manley's annual salary to $900,000, awarded him an $850,000 incentive bonus, and agreed to a "rolling" five-year employment contract.
 
 D. The Finley Kumble Bankruptcy
 
 10
 A few months later, in February 1988, Finley Kumble's creditors forced the firm into involuntary bankruptcy, with numerous lawsuits filed against Manley, Manley P.C., and the firm's other partners, either individually or in the names of their professional corporations. Consolidating these claims into two actions, the bankruptcy trustee charged, inter alia, that Manley had effectively ceased to practice law for Finley Kumble after becoming president of AmBase and sued to recover over $5 million paid by the law firm to Manley P.C. in 1985-87. The trustee further asserted that any monies Manley received from AmBase while he was still a Finley Kumble partner were recoverable by the bankrupt estate as partnership income.
 
 
 11
 Scharffenberger directed AmBase's attorneys to represent Manley in the Finley Kumble bankruptcy proceeding, which action was formally ratified by the AmBase board on May 20, 1988. Meanwhile, in April 1988, Manley, through counsel, advised the trustee that he could not be held personally liable on any bankruptcy claims since he had not been a partner of Finley Kumble at the relevant time and had not executed any agreement assuming personal liability for the firm's obligations. Only Manley P.C. had been the firm's partner, and even it could not be liable on the bankruptcy claims because its 1987 agreement withdrawing from the partnership absolved it of any responsibility for the costs or expenses of the firm. Indeed, counsel claimed Manley P.C. was a creditor of the law firm, owed in excess of $500,000 pursuant to the withdrawal agreement.
 
 E. AmBase Terminates Manley
 
 12
 The Finley Kumble bankruptcy proceeding generated considerable adverse media attention for Manley, prompting commercial banks that had extended credit to AmBase to seek his ouster from the corporation. When AmBase terminated Manley's employment on March 15, 1990, Manley threatened suit for breach of his employment contract.
 
 
 13
 On January 31, 1991, the parties entered into a written settlement whereby, in return for Manley's voluntary resignation, AmBase paid its former president over $3 million and forgave approximately $4 million in outstanding loans. AmBase also agreed to continue paying his legal fees in connection with the Finley Kumble bankruptcy proceeding and to "indemnify and defend [Manley] in connection with matters arising from [his] service as a Director, officer or employee of AmBase." Jan. 31, 1991 Agreement at 5.
 
 
 14
 F. Manley Settles with the Bankruptcy Trustee
 
 
 15
 Concerned about his ability to pierce the corporate veils of Finley Kumble's professional corporation partners, the bankruptcy trustee actively pursued settlement negotiations. On September 24, 1991, the trustee entered into a written agreement with Manley and Manley P.C. that settled the bankrupt estate's claims against both for $4.5 million, payable through a combination of promissory notes executed by Manley and a percentage of his future income.
 
 
 16
 G. Manley's May 27, 1993 Settlement with AmBase
 
 
 17
 The following month, in October 1991, Manley sued AmBase to recover certain long-term compensation and retirement benefits and to demand indemnification in eighteen enumerated lawsuits. Not included among the suits for which Manley sought indemnification was his recent settlement in the Finley Kumble bankruptcy proceeding. After extensive negotiations, the parties entered into an agreement on May 27, 1993, whereby AmBase paid Manley another $600,000 and, with respect to indemnification, agreed as follows:
 
 
 18
 If Manley has been or is made a party... to any action, suit or proceeding ... by reason of the fact that he was a director or officer of AmBase ... or by reason of the fact that he was serving at the request of AmBase as a director, officer, member, employee or agent of another corporation or of a partnership, joint venture, trust or other enterprise,... he shall be indemnified and held harmless by AmBase ... against all expense, liability and loss (including, without limitation, attorneys' fees, judgments, fines, ERISA excise taxes or penalties and amounts paid or to be paid in settlement) reasonably incurred or suffered by Manley in connection therewith....
 
 
 19
 May 27, 1993 Settlement Agreement at ¶ 5(a). It is this indemnification provision that is at issue in this case.[3]
 
 
 20
 H. Manley's Revised Settlement with the Bankruptcy Trustee
 
 
 21
 In July 1992, Manley approached the Finley Kumble trustee to explore the possibility of discounting his $4.5 million obligation in return for an expedited cash payment. When the trustee rejected this proposal, Manley revealed that his promissory notes to the bankrupt estate were secured not by his family's $3.875 million Park Avenue residence, as the trustee had understood, but by an adjacent studio apartment valued at approximately $350,000. With Manley threatening personal bankruptcy if he were sued in connection with the Finley Kumble settlement, and with so little security for his multi-million dollar indebtedness, the trustee, in September 1993, accepted a cash payment of $2.43 million in satisfaction of Manley's obligation.
 
 
 22
 I. Manley Demands Indemnification from AmBase
 
 
 23
 Approximately three years later, in a letter dated July 22, 1996, counsel for Manley invoked the parties' May 27, 1993 settlement agreement to demand that AmBase indemnify Manley for his $2.43 million settlement of the Finley Kumble bankruptcy claims. By letter dated October 3, 1996, AmBase rejected Manley's claim, thereby prompting this lawsuit.
 
 J. The First Trial
 
 24
 In suing AmBase, Manley charged that his former employer was obliged to indemnify him for his settlement with the Finley Kumble estate pursuant to ¶ 5(a) of the parties' May 27, 1993 agreement because, "[a]t the time" AmBase hired him, Manley "was a member of" the Finley Kumble firm. More to the point, "AmBase was aware of Manley's relationship with Finley Kumble, and requested that Manley serve as a member of Finley Kumble during the term of his employment with AmBase." Complaint ¶ 6.
 
 
 25
 Although trial exhibits indicated that Manley P.C. and not Manley individually was the actual Finley Kumble partner, Manley's counsel wasted little time in summation dismissing the distinction as irrelevant to the real matters in dispute:
 
 
 26
 I want to spend a minute with you on this issue of Mr. Manley or Mr. Manley, PC. Everybody ... knew Mr. Manley and Mr. Manley, PC were one and the same, that Mr. Manley served in this capacity through his PC. Lots of lawyers did it in that period of time, and I suggest to you that this is a non-issue. The issue here is, did Mr. Scharffenberger make that request. That's what you need to spend time with.
 
 
 27
 Trial I Trans. at 692. AmBase counsel did not contradict this view, stating simply, "[i]f Manley, I said if Manley, because it's Marshall Manley PC, serving at the request, he wasn't serving at the request." Id. at 736. Certainly, neither party sought any jury instruction on the legal significance of Manley P.C. serving as the Finley Kumble partner.
 
 
 28
 Nevertheless, after the jury retired to begin its deliberations, AmBase advanced as one among many arguments in support of its motion for judgment as a matter of law, see Fed.R.Civ.P. 50(a)(1), the fact that "Marshall Manley PC was the partner at Finley Kumble, not Marshall Manley. This indemnity provision goes to Marshall Manley." Trial I Trans. at 806.[4] Manley's counsel responded that the point was irrelevant: "Everybody but everybody recognized that he was serving through a PC. The question is did they request him either individually or through his PC to serve at their behest." Id. at 814. The court reserved on the motion pending the jury verdict.
 
 
 29
 On May 17, 2000, the jury returned a verdict in favor of Manley and awarded him $1.8 million on his indemnification claim.
 
 K. The District Court Orders a New Trial
 
 30
 AmBase thereafter renewed its Rule 50 motion and sought a new trial pursuant to Rule 59(a). In a thoughtful and detailed opinion dated December 1, 2000, the district court concluded that the evidence did not support the jury verdict because it was undisputed that Manley P.C., not Manley individually, had been a Finley Kumble partner at the relevant time. Manley v. AmBase Corp., 121 F.Supp.2d 758, 768 (S.D.N.Y.2000). Rejecting Manley's argument that the distinction was of no legal significance, the court noted that (1) the law strictly construes indemnification agreements; (2) the agreement at issue provided for indemnification only of Manley, the individual, with no mention of Manley P.C.; and (3) corporate law regularly distinguishes between a corporation and its shareholders. Id. at 769-70. Nevertheless, the court chose to order a new trial rather than enter judgment as a matter of law in favor of AmBase because the evidence could support Manley's indemnification claim on theories other than partnership, notably, agency.[5] Id. at 772.
 
 L. The Second Trial
 
 31
 When the case was retried in November 2001, Manley offered the jury a variety of theories to support his indemnification claim under ¶ 5(a) of the parties' agreement: (1) the Finley Kumble trustee had sued him because he was an officer and director of AmBase; (2) Scharffenberger had requested that Manley continue to serve as an officer, director, employee, and agent of Manley P.C. and that the corporation continue as a partner at Finley Kumble; and (3) Scharffenberger had requested Manley to serve as an agent of Finley Kumble by virtue of his role as co-manager of the firm, or as a sub-agent of the firm by virtue of his role as the sole officer, director, employee, and agent of partner Manley P.C. The jury, however, found that AmBase was not obligated by the May 27, 1993 settlement agreement to indemnify Manley for payments made to the Finley Kumble bankrupt estate, and, accordingly, the court entered judgment in favor of defendant.
 
 II. Discussion
 
 32
 A. The Grant of AmBase's Motion for a New Trial
 
 1. Standard of Review
 
 33
 Manley submits that the district court erred when it ordered a second trial pursuant to Rules 50(b)(1)(B) and 59(a) rather than enter judgment in his favor in accordance with the first jury verdict. Because we may affirm the district court's decision under either rule, see ACEquip Ltd. v. American Eng'g Corp., 315 F.3d 151, 155 (2d Cir.2003), we focus on Rule 59(a), which has a less stringent standard than Rule 50 in two significant respects: (1) a new trial under Rule 59(a) "may be granted even if there is substantial evidence supporting the jury's verdict," and (2) "a trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner," DLC Mgmt. Corp. v. Town of Hyde Park, 163 F.3d 124, 133-34 (2d Cir.1998). That being said, for a district court to order a new trial under Rule 59(a), it must conclude that "`the jury has reached a seriously erroneous result or ... the verdict is a miscarriage of justice,'" i.e., it must view the jury's verdict as "against the weight of the evidence." Id. at 133 (quoting Song v. Ives Labs., Inc., 957 F.2d 1041, 1047 (2d Cir.1992) (internal citations omitted)).
 
 
 34
 Our review of a district court's decision to grant a Rule 59(a) motion is deferential; we will reverse only for abuse of discretion. See Amorgianos v. National R.R. Passenger Corp., 303 F.3d 256, 261 (2d Cir.2002). A district court abuses its discretion when "(1) its decision rests on an error of law (such as the application of the wrong legal principle) or a clearly erroneous factual finding, or (2) its decision — though not necessarily the product of a legal error or a clearly erroneous factual finding — cannot be located within the range of permissible decisions." Zervos v. Verizon N.Y., Inc., 252 F.3d 163, 169 (2d Cir.2001) (footnotes omitted).
 
 
 35
 Applying this standard to the challenged decision in this case, we conclude that the district court acted within its discretion in ordering a second trial.
 
 
 36
 2. The May 27, 1993 Settlement Agreement Provides Indemnification to Manley Individually, not to Manley P.C.
 
 
 37
 Manley's indemnification claim derives from ¶ 5(a) of the parties' May 27, 1993 settlement agreement. Paragraph 15 of that agreement provides that it "shall be construed and enforced in accordance with the laws of the state of New York." May 27, 1993 Settlement Agreement ¶ 15. New York law requires indemnification agreements to be strictly construed; a court cannot find a duty to indemnify absent manifestation of an "unmistakable intention" to indemnify. Heimbach v. Metropolitan Transp. Auth., 75 N.Y.2d 387, 392, 553 N.Y.S.2d 653, 657, 553 N.E.2d 242 (1990); accord Commander Oil Corp. v. Advance Food Serv. Equip., 991 F.2d 49, 51 (2d Cir.1993).
 
 
 38
 With that principle in mind, we note that ¶ 5(a) expresses the parties' clear intent for AmBase to indemnify "Manley" if he was sued by reason of serving in certain specified capacities at AmBase's request. "Manley" is defined in the opening paragraph of the agreement as "Marshall Manley," i.e., the individual, with no reference to the corporate entity, Manley P.C. Although Manley urged the district court to view the distinction between himself and his corporation as irrelevant, the rules of both strict construction and corporate organization dictate otherwise. As we noted in LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham, 185 F.3d 61, 66 (2d Cir.1999) (citing We're Assocs. Co. v. Cohen, Stracher & Bloom, P.C., 65 N.Y.2d 148, 490 N.Y.S.2d 743, 480 N.E.2d 357 (1985)), the principal advantage of the corporate form is to shield shareholders against personal liability by distinguishing them from the corporations in which they hold interests. As an experienced attorney, Manley certainly understood this point. Indeed, the evidence indicates that he did not hesitate to invoke the corporate shield to his personal advantage in his dealings both with Finley Kumble and with the Finley Kumble trustee. See supra at I. D.
 
 
 39
 Accordingly, we agree with the district court that a strict construction of ¶ 5(a) of the parties' agreement extends indemnification protection only to Manley individually and not to Manley P.C.
 
 
 40
 3. Evidence of Manley's Individual Roles at Finley Kumble
 
 
 41
 At the first trial, Manley based his indemnification claim on his having honored AmBase's request that he continue as a partner at Finley Kumble. Because the uncontradicted evidence showed that Manley P.C., not Manley individually, was the Finley Kumble partner, the district court concluded that a jury verdict for Manley on a partnership theory was manifestly erroneous. On appeal, Manley does not challenge this conclusion. Rather, he asserts that he was nevertheless entitled to a judgment in his favor because the evidence sufficed to demonstrate his personal service in other roles covered by ¶ 5(a) of the parties' agreement. Citing the First Circuit's decision in Foster-Miller, Inc. v. Babcock & Wilcox Canada, 210 F.3d 1 (1st Cir.2000), Manley submits that a verdict must be upheld "so long as the evidence makes it reasonable under `any permissible claim or theory,'" id. at 12 (emphasis in original) (quoting Collazo-Santiago v. Toyota Motor Corp., 149 F.3d 23, 27 (1st Cir.1998)).
 
 
 42
 Manley's reliance on Foster-Miller and Collazo-Santiago is misplaced. In both cases, the First Circuit was reviewing denials of Rule 50 motions to set aside verdicts and enter judgments as a matter of law. It was in that context that the court ruled that judgments would be upheld if supported by "any permissible theory." But as we noted at the outset, a less stringent standard applies to motions for new trials pursuant to Rule 59(a). Specifically, a district court may grant a new trial even where "there is substantial evidence to support the jury's verdict" if the court is convinced that the verdict was manifestly erroneous. Caruolo v. John Crane, Inc., 226 F.3d 46, 54 (2d Cir.2000); DLC Mgmt. Corp. v. Town of Hyde Park, 163 F.3d at 133.
 
 
 43
 In this case, the district court plainly recognized the existence of some evidence supporting Manley's indemnification claim on the alternative theory that he had served as an "agent" of Finley Kumble, either directly or as a sub-agent of Manley, P.C. But the court was further mindful that this theory had not been tested through the normal adversary process. Indeed, because Manley did not argue agency, or any theory other than partnership, at the first trial, AmBase had no reason to defend against other theories of liability. Likewise, the court had no reason to charge on agency, making it unlikely that the jury considered this alternative, and certain that it did not consider it with a full appreciation for its elements. See Cabrera v. Jakabovitz, 24 F.3d 372, 386 (2d Cir.1994) (stating that agency requires a showing of (1) "the manifestation by the principal that the agent shall act for him," (2) "the agent's acceptance of the undertaking," and (3) the parties' understanding "that the principal is to be in control of the undertaking" (quoting Restatement (Second) of Agency § 1 cmt. b (1958))).
 
 
 44
 Given the totality of these circumstances, the district court was by no means obliged to enter judgment in favor of Manley. Rather, with due regard for fairness to both sides, and a proper concern that a jury clearly understand the applicable principles of law, the district court acted within its discretion in ordering a new trial. See generally MacPherson v. University of Montevallo, 922 F.2d 766, 776-77 (11th Cir.1991) (upholding district court's decision to order a new trial on various grounds, including likely juror confusion at first trial).
 
 
 45
 B. The Exclusion of the Scharffenberger Discovery Deposition
 
 
 46
 Twice before trial, the parties deposed former AmBase chairman George Scharffenberger, once as part of the discovery process and again pursuant to a de bene esse[6] proceeding ordered by the court when it appeared that the eighty-year old California resident would not travel to New York for trial. When AmBase offered the videotaped de bene esse deposition into evidence at the first trial, the district court allowed Manley to counter with excerpts from Scharffenberger's discovery deposition. Shortly before the second trial, the district court revisited its ruling and concluded that Manley would not be permitted to offer excerpts from the discovery deposition because he had not questioned Scharffenberger about the matters contained therein at the de bene esse proceeding.[7] In explaining its ruling, the court stated:
 
 
 47
 It would appear to me that the plaintiff had a full and fair opportunity to be present and to inquire at the de bene esse deposition of Mr. Scharffenberger. You had the deposition, which had been taken previously. You had every right to ask whatever questions were appropriate based on that deposition. If you had chosen to do so, you would have gotten your answers. Since you chose not to avail yourself of all aspects of that deposition, I liken this to a situation where a witness has testified at trial, has left the stand, has left the state, and at that point, a party determines to put additional matters into evidence.
 
 
 48
 Trial II Trans. at 33. Manley now challenges the district court's ruling as at odds with Fed.R.Civ.P. 32(a).
 
 
 49
 We review a district court's evidentiary rulings for abuse of discretion, United States v. Fabian, 312 F.3d 550, 557 (2d Cir.2002), cert. denied, ___ U.S. ___, 123 S.Ct. 1958, 155 L.Ed.2d 871 (2003), and will reverse only for manifest error, Luciano v. Olsten Corp., 110 F.3d 210, 217 (2d Cir.1997). In conducting our review, we are mindful of the "wide latitude" afforded district courts both in determining whether evidence is admissible, Meloff v. New York Life Ins. Co., 240 F.3d 138, 148 (2d Cir.2001), and in controlling "the mode and order" of its presentation to promote the effective ascertainment of the truth, Fed.R.Evid. 611(a).
 
 
 50
 Rule 32(a) permits deposition testimony to be used "so far as admissible under the rules of evidence applied as though the witness were then present and testifying." By its terms, the rule draws no distinction between depositions taken for purposes of discovery and those taken for use at trial. See United States v. International Business Machines Corp., 90 F.R.D. 377, 381 (S.D.N.Y.1981) (quoted in Tatman v. Collins, 938 F.2d 509, 511 (4th Cir.1991)). Thus, Manley asserts that because Scharffenberger was not available to testify at trial, the district court should have admitted both his de bene esse and discovery depositions under Fed.R.Evid. 804(b)(1) (creating hearsay exception for former testimony of unavailable witness).[8]
 
 
 51
 That argument, however, ignores the district court's directive that Scharffenberger's de bene esse deposition "substitut[e] for trial testimony" and that the parties conduct themselves at this deposition "as though [they] were at trial." Oct. 4, 1999 Trans. at 8. Experienced counsel would understand this instruction to mean that Scharffenberger would not be viewed as an "unavailable" trial witness within the meaning of Rule 804(b)(1). Rather, his de bene esse testimony would be admitted as the equivalent of trial testimony, with impeachment governed by Fed.R.Evid. 613(b) ("Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same ...."[9]). See generally United States v. International Business Machines Corp., 90 F.R.D. at 382 (refusing to admit deposition testimony of witness who had been excused at trial without any effort to elicit evidence now offered through deposition); see also Gracia v. Lee, 976 F.2d 1344, 1345-46 (10th Cir.1992) (upholding district court's decision to exclude statements from "discovery" deposition where no good cause excused counsel's failure to examine witness about these statements at "preservation" deposition). The fact that Manley's counsel did question Scharffenberger at the de bene esse deposition with respect to certain aspects of his discovery deposition undermines Manley's argument that he did not understand the significance of that proceeding.
 
 
 52
 In any event, even "[a]n evidentiary ruling that is an abuse of discretion is... only reversible if it also affects a party's substantial rights." Schering Corp. v. Pfizer Inc., 189 F.3d 218, 224 (2d Cir.1999) (citing Fed.R.Evid. 103(a)). This determination requires an "assessment of the likelihood that the error affected the outcome of the case." Malek v. Federal Ins. Co., 994 F.2d 49, 55 (2d Cir.1993) (internal quotations and citations omitted). Here, Manley cannot demonstrate that the exclusion of Scharffenberger's deposition testimony affected the outcome of the case because the relevant facts contained therein were put before the jury through other exhibits. Manley asserts that the following excerpt from the discovery deposition would have allowed him to impeach Scharffenberger's de bene esse testimony that he never requested that Manley stay and serve at Finley Kumble:
 
 
 53
 Q As you sit here today Mr. Scharffenberger, do you ever recall going to a personnel committee meeting ... to request that Mr. Manley serve or continue to serve at Finley Kumble on behalf of [AmBase]?
 
 
 54
 A I think the answer is yes during that initial period.
 
 
 55
 Q You asked the board's permission or the personnel committee's permission?
 
 
 56
 A I was asking them for their approval.
 
 
 57
 Trial I Trans. at 452. Although this statement was excluded, similar evidence came before the jury through the March 18, 1986 minutes of the AmBase personnel committee: "[Mr. Scharffenberger] reminded the Committee that Mr. Manley is a Senior Partner in one of the Country's largest law firms and that it was his desire to have Mr. Manley continue to serve in that role." Mar. 18, 1986 Personnel Comm. Minutes at 1.
 
 
 58
 We therefore reject Manley's claim that the district court abused its discretion in excluding statements made by Scharffenberger at his discovery deposition or that his substantial rights were adversely affected by that ruling.
 
 
 59
 C. The Limiting Instruction Regarding Documentary Exhibits
 
 
 60
 Manley further asserts that the district court erred in giving a limiting instruction at the second trial with respect to two pieces of documentary evidence: (1) a June 22, 1993 letter from Manley to AmBase demanding payment of a bill from the accounting firm of Grant Thornton incurred in connection with the Finley Kumble bankruptcy; and (2) a September 15, 1993 letter from Manley to AmBase demanding payment of a bill from the law firm of Cahill Gordon & Reindel, incurred in connection with unrelated securities litigation.[10] Manley argues that the court's instruction (1) ignored the parties' pretrial order, which identified the letters as joint exhibits, with neither party reserving objections as to their use at trial; and (2) impermissibly invaded the fact-finding province of the jury.
 
 
 61
 Rule 16(e) of the Federal Rules of Civil Procedure provides that pretrial orders "shall control the subsequent course of the action," and "shall be modified only to prevent manifest injustice." This does not mean that a pretrial order is a legal "`strait-jacket' binding the parties and court to an unwavering course at trial." Napolitano v. Compania Sud Americana De Vapores, 421 F.2d 382, 386 (2d Cir.1970). District courts have considerable discretion in the management of trials, and this necessarily "includes a certain amount of latitude to deviate from the terms of [a] pretrial order." HBE Leasing Corp. v. Frank, 22 F.3d 41, 45 (2d Cir.1994). Such flexibility is particularly important when a district court performs its unique role to instruct a jury with respect to the governing principles of law and the permissible uses of evidence.
 
 
 62
 In this case, Manley wished the jury to infer from AmBase's payment of the Grant Thornton and Cahill Gordon & Reindel bills that the corporation acknowledged its obligation to indemnify him in connection with the Finley Kumble settlement. As the district court correctly recognized, such an argument risked jury confusion with respect to AmBase's indemnification obligations pursuant to ¶ 5(a) and ¶ 5(c) of the parties' May 27, 1993 agreement. Manley dismisses this concern, submitting that the parties intended the two sections to be coterminus. We must reject this construction of the agreement as contrary to New York law, which disfavors interpretations that render contract provisions meaningless or superfluous. Galli v. Metz, 973 F.2d 145, 149 (2d Cir.1992); accord International Multi-foods Corp. v. Commercial Union Ins. Co., 309 F.3d 76, 86 (2d Cir.2002). The construction is similarly at odds with the plain language of the agreement. Seabury Construction Corp. v. Jeffrey Chain Corp., 289 F.3d 63, 68 (2d Cir.2002). Paragraph 5(a) — the sole provision on which Manley bases his indemnification claim — depends on Manley's assumption of certain specified roles at AmBase's request. Paragraph 5(c), however, provides potentially broader protection, noting that the indemnification rights conferred in ¶ 5 "shall not be exclusive of any other right that Manley may have under any statute, provision of the certificate of incorporation or by-laws of AmBase, agreement, vote of stockholders or disinterested directors or otherwise." May 27, 1993 Settlement Agreement at ¶ 5(c).
 
 
 63
 With respect to the Grant Thornton bill, the evidence of a distinct AmBase obligation under ¶ 5(c) was considerably stronger than any obligation under ¶ 5(a). Specifically, on May 20, 1988, the AmBase board expressly voted to retain "attorneys and experts ... to assist Mr. Manley in the administration and supervision of claims" arising out of the Finley Kumble bankruptcy. By contrast, the board never voted for AmBase to indemnify Manley for his settlement of the bankruptcy claims. Under these circumstances, for the jury to conclude from AmBase's payment of the Grant Thornton bill the corporation's acknowledgment of a ¶ 5(a) obligation to indemnify Manley for the bankruptcy settlement would have required impermissible speculation. The district court acted well within its discretion in giving a limiting instruction to ensure against such speculation. See generally Fed.R.Evid. 403 (permitting exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury").
 
 
 64
 As for AmBase's payment of the Cahill Gordon & Reindel bill, because these attorneys' fees were incurred in the course of unrelated securities litigation, AmBase's payment, whether pursuant to ¶ 5(a) or ¶ 5(c), could not support an inference that the corporation thought itself obliged to indemnify Manley for his bankruptcy settlement. Here too, the challenged limiting instruction was plainly within the district court's discretion.
 
 
 65
 D. The Denial of Manley's Motion for a New Trial
 
 
 66
 A December 9, 2001 letter to the court from a juror who had served at Manley's second trial prompted Manley to move for yet another trial pursuant to Fed.R.Civ.P. 59(a). Specifically, the juror expressed concern about remarks made by three fellow jurors at the start of deliberations suggesting that they had made up their minds against Manley. The juror reported that she had disclosed her concern to the court's deputy clerk and inquired about speaking with the judge. In response, the clerk suggested simply that the concerned juror "try to convince [her fellow] juror that she was wrong." Dec. 9, 2001 Juror Letter.
 
 
 67
 Manley submitted that the deputy clerk's conduct warranted a new trial because (1) his failure to communicate the juror's concerns in a timely manner deprived Manley of the opportunity to have the court inquire into jury bias, and (2) his instruction to the juror exerted an impermissible influence on the jury's deliberations.
 
 
 68
 By memorandum decision dated March 18, 2002, the district court denied the new trial motion, ruling that any inquiry into the jurors' thought processes during deliberations was precluded by Fed.R.Evid. 606(b). Although faulting the deputy clerk for failing to inform the court of his communication with a deliberating juror, the district court concluded that any error was harmless because the juror's own letter revealed that the verdict was the result of a unanimous conclusion that Manley had failed to carry his burden of proof.[11]
 
 
 69
 As we have already observed, a district court may grant a new trial if it concludes that "the jury has reached a seriously erroneous result or ... the verdict is a miscarriage of justice." DLC Mgmt. Corp. v. Town of Hyde Park, 163 F.3d at 133 (internal quotations and citations omitted). We review for abuse of discretion. Amorgianos v. National R.R. Passenger Corp., 303 F.3d at 261.
 
 
 70
 Manley's argument that the deputy clerk's failure to report the juror's concerns deprived him of an opportunity to have the court inquire into jury bias merits little discussion. As the district court correctly observed, Rule 606(b) precludes such an inquiry into the "mind or emotions" of deliberating jurors. See United States v. Thomas, 116 F.3d 606, 620 (2d Cir.1997) ("The mental processes of a deliberating juror with respect to the merits of the case at hand must remain largely beyond examination and second-guessing, shielded from scrutiny by the court as much as from the eyes and ears of the parties and the public."); United States v. Sun Myung Moon, 718 F.2d 1210, 1235 (2d Cir.1983) (affirming district court decision not to question juror post-verdict, because Rule 606(b) precluded any inquiry into "her mind or emotions as influencing her to assent to or dissent from the verdict").[12]
 
 
 71
 As for the deputy clerk's own communication to the deliberating juror, we conclude that such contact was improper. Justice demands that jurors "decide the case solely on the evidence" before them, without any outside influence. United States v. Olano, 507 U.S. 725, 738, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). That does not, however, mean that a new trial is required whenever a juror has been exposed to extrinsic information or outside contacts. See United States v. Schwarz, 283 F.3d 76, 99 (2d Cir.2002) ("The government is correct that not every instance of a juror's exposure to extrinsic information results in the denial of a defendant's right to a fair trial. Many such instances do not."). The issue, as Judge Friendly observed, is "not the mere fact of [jury] infiltration ... but the nature of what has been infiltrated and the probability of prejudice." United States ex rel. Owen v. McMann, 435 F.2d 813, 818 (2d Cir.1970) (quoted in Loliscio v. Goord, 263 F.3d 178, 185 (2d Cir.2001) (noting that courts frequently proceed immediately to a consideration of whether the charged jury contact is harmless)).
 
 
 72
 Precisely because Rule 606(b) precludes a court from inquiring into "the degree upon which ... extra-record information was used in deliberations and the impression which jurors actually had about it," United States v. Greer, 285 F.3d 158, 173 (2d Cir.2002) (quoting United States v. Calbas, 821 F.2d 887, 897 (2d Cir.1987)), an analysis of prejudice cannot be based on the subjective reports of the actual jurors. Rather, courts must apply an "objective test," id., focusing on two factors: (1) "the nature" of the information or contact at issue, and (2) "its probable effect on a hypothetical average jury," United States v. Schwarz, 283 F.3d at 99 (quoting United States v. Crosby, 294 F.2d 928, 950 (2d Cir.1961)); accord United States v. Greer, 285 F.3d at 173. In this one respect, the able district judge appears to have erred, basing his harmlessness conclusion, at least in part, on a subjective report of the course of jury deliberations by the author of the December 9, 2001 letter. See Bibbins v. Dalsheim, 21 F.3d 13, 16-17 (2d Cir.1994) (holding that juror affidavit about effect of extraneous information on jury deliberation was not properly considered in objectively assessing prejudice). In some cases where such an error occurs, it might be appropriate for us to remand a case to the district court to allow it to apply the objective test of prejudice in light of its superior knowledge of the dynamics of the particular trial, including the jury deliberations. In this case, however, we conclude that no remand is necessary because the objective harmlessness of the deputy clerk's conduct is beyond question.
 
 
 73
 Significant to our conclusion is the nature of the deputy clerk's communication to the concerned juror. Specifically, the clerk's statement does not fit into any of the three categories that most frequently raise prejudice concerns. It did not convey any extra-record information to the juror. See, e.g., United States v. Schwarz, 283 F.3d at 99 (holding that jury's exposure to news of co-defendant's admission to committing crime with another person could not be dismissed as harmless). Neither did it attempt to tell the juror how she should decide the case. See, e.g., Remmer v. United States, 347 U.S. 227, 228, 74 S.Ct. 450, 98 L.Ed. 654 (1954) (unnamed person told jury foreman that "he could profit by bringing in a verdict favorable to the petitioner"). And certainly, it did not apply any coercion to the deliberative process. See, e.g., Haugh v. Jones & Laughlin Steel Corp., 949 F.2d 914, 916-19 (7th Cir.1991) (marshal told jurors that there is "no such thing as a hung jury" and that they would be "kept in custody for as long as it took them to reach a verdict"). The statement simply encouraged the juror, however inartfully, to participate fully in the deliberative process and not to assume that her views could not make an impact on her fellow jurors. While we reiterate the importance of court personnel refraining from any conversations with jurors that relate to the performance of their duties — that task being the exclusive province of the trial judge — we conclude that the nature of the jury contact at issue was not the sort likely to cause prejudice.[13]
 
 
 74
 Indeed, the probable effect of the challenged contact on the deliberations of "a hypothetical average juror" would likely be either insignificant, because it conveyed nothing that the juror would not have gleaned from the court's charge, see generally United States v. Weiner, 578 F.2d 757, 765 (9th Cir.1978) (rejecting claim that clerk prejudiced juror when, in response to her inquiry about judge expecting a verdict, he stated that he assumed judge would "like" a verdict; "[s]ince the alleged conversation occurred ... nearly a week after the judge had given the Allen charge..., it should have been apparent to even the most obtuse juror that a verdict would be a welcomed development"), or, at most, benignly neutral, see generally United States v. Madrid, 842 F.2d 1090, 1091, 1093 (9th Cir.1988) (rejecting misconduct charge against court clerk who calmed juror after a hostile exchange with a fellow juror, telling her "to settle her differences with the other juror and thereafter to resume deliberations").
 
 
 75
 Further supporting a conclusion that any error in the clerk's communication was harmless is the fact that the jury deliberated for approximately five hours over the course of two days before returning a verdict. During that time, the jury submitted a number of notes requesting specific evidence and further legal instructions. Nothing in these communications or in any part of the trial record suggests that the members of the jury experienced any difficulty pursuing responsible deliberations.
 
 
 76
 For all these reasons, we reject Manley's challenge to the district court's denial of his motion for a new trial.
 
 III. Conclusion
 
 77
 The judgment of the district court entered in favor of AmBase is hereby AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 For simplicity, Home Group, Inc. and AmBase will hereafter be referred to as "AmBase."
 
 
 [2]
 Pursuant to the Finley Kumble partnership agreement, which each partner signed annually, members of the firm agreed to treat any compensation they received for personal services as partnership income. Further, attorneys who joined the partnership through professional corporations were expected to sign separate agreements personally guaranteeing the firm's obligations
 
 
 [3]
 The May 27, 1993 agreement further stated that the indemnification rights it conferred "shall not be exclusive of any other right that Manley may have under any statute, provision of the certificate of incorporation or by-laws of Ambase, agreement, vote of stockholders or disinterested directors or otherwise."Id. at ¶ 5(c). Manley does not, however, base his instant claim for indemnification on ¶ 5(c) or "any other right" than that conferred in ¶ 5(a).
 
 
 [4]
 In moving for judgment as a matter of law at the close of Manley's case, AmBase's counsel had summarily described plaintiff's case as "legally insufficient,"see Fed.R.Civ.P. 50(a)(1), but made no mention of the distinction between Manley and Manley P.C. At the close of the entire case, counsel for both sides agreed to defer legal motions until after the jury began its deliberations.
 
 
 [5]
 On appeal, AmBase faults the district court for ordering a new trial to allow Manley to present an alternative theory of liability. It submits that judgment should simply have been entered in favor of AmBase. Because we affirm judgment in favor of AmBase at the second trial, we need not address the merits of this argument
 
 
 [6]
 See Black's Law Dictionary 408 (7th ed.1999) (explaining a de bene esse deposition as one taken "in anticipation of a future need").
 
 
 [7]
 Although Manley complains that AmBase's motion to preclude the use of Scharffenberger's discovery deposition was not made until the eve of the second trial, the record fails to evidence prejudice, particularly since Manley did not seek a continuance or move to reopen thede bene esse deposition.
 
 
 [8]
 To the extent Manley argues that Scharffenberger's responses at his discovery deposition were also admissible pursuant to Fed.R.Evid. 804(b)(3), he offers no support for his conclusory assertion that the statements were "at the time of [their] making so far contrary to the declarant's pecuniary or proprietary interest that a reasonable person in the declarant's position would not have made the statement unless believing it to be true," Appellant's Brief at 50See United States v. Tropeano, 252 F.3d 653, 658-59 (2d Cir.2001) (emphasizing need to ensure that each statement offered pursuant to 804(b) is self-inculpatory of declarant) (citing Williamson v. United States, 512 U.S. 594, 599-601, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994)).
 
 
 [9]
 Rule 613(b) expressly states that its limitations do not apply to admissions of a party opponent,see Fed.R.Evid. 801(d)(2), but Manley did not offer Scharffenbergers's discovery deposition as such, presumably because the witness had retired from AmBase several years before that examination.
 
 
 [10]
 The challenged instruction stated:
 As I have told you, the dispute in this lawsuit is limited to paragraphs 5(a) and 5(b) of the May 27, 1993 settlement agreement, which I have just read to you. Paragraph 5(c), which relates to other rights granted to plaintiff by the AmBase board of directors, has no bearing on this lawsuit, and you must not consider it during your deliberation.
 During the trial, certain exhibits relating to AmBase's obligations under paragraph 5(c) were admitted into evidence. Joint Exhibit 17 sets forth that on May 20, 1988, the board of directors of AmBase voted to hire the law firm of Cravath, Swaine & Moore and the accounting firm of Grant Thornton to represent plaintiff in the Finley Kumble bankruptcy. Joint Exhibits 67 and 73 are letters from Mr. Manley to AmBase requesting that the corporation pay bills for Grant Thornton and Cahill Gordon, another law firm that represented Mr. Manley in matters unrelated to the Finley Kumble bankruptcy. These exhibits and AmBase's payment of Cravath, Grant Thornton and Cahill Gordon bills are not to be considered by you as evidence of any duty on the part of AmBase to indemnify Manley under paragraph 5(a) of the May 27, 1993 settlement agreement for the payments made by Manley in the Finley Kumble bankruptcy.
 Trial II Trans. at 1073-74. It appears that no such instruction was given at the first trial.
 
 
 [11]
 In her letter, the juror reported that during deliberations, the jurors, with one exception, had agreed that AmBase had committed to indemnify Manley; nevertheless, they returned a verdict in favor of AmBase because Manley had failed to prove that his own actions were undertaken in good faith. The juror characterized this verdict as "legally (technically) correct, but morally wrong." Dec. 9, 2001 Juror Letter
 
 
 [12]
 Of course, had the court clerk promptly alerted the trial judge to his discussion with the juror, a different and narrower sort of inquiry than that urged by Manley might have been appropriate to ascertain the exact exchange between the juror and the clerk and any communication of the clerk's response to other jurors. The lack of such an inquiry does not merit reversal in this case for the reasons stated in the ensuing text discussion of the nature of the clerk communication at issue
 
 
 [13]
 See also Sea Hawk Seafoods, Inc. v. Alyeska Pipeline Serv. Co., 206 F.3d 900, 906-07 (9th Cir.2000) (distinguishing cases involving juror exposure to extrinsic evidence or coercion from those involving ex parte contacts unrelated to any fact in controversy or law applicable to the case and holding that, in the latter circumstance, a new trial is warranted only on a showing of "actual prejudice").