33 A.3d 527 (2011)
423 N.J. Super. 453
STATE of New Jersey, Plaintiff-Respondent,
v.
Shaffona MORGAN, Defendant-Appellant.
Docket No. A-4468-08T4
Superior Court of New Jersey, Appellate Division.
Submitted May 18, 2011.
Decided December 29, 2011.
*529 Yvonne Smith-Segars, Public Defender, attorney for appellant (Daniel Brown, Designated Counsel, on the brief).
Joseph L. Bocchini, Jr., Mercer County Prosecutor, attorney for respondent (Daniel A. Matos, Assistant Prosecutor, of counsel and on the brief).
Before Judges FUENTES, NUGENT and KESTIN.
The opinion of the court was delivered by
FUENTES, J.A.D.
On Thanksgiving day, November 24, 2005, seventeen-year-old Shaffona Morgan shot Juan Carlos Martinez (Juan Carlos), the son of grocery store owner Juan Battista Martinez (Juan Battista)[1], following an argument over a used Boost Mobile phone card defendant had purchased at the store earlier in the day. As a result, defendant was indicted by a Mercer County Grand Jury and charged with first degree attempted murder, N.J.S.A. 2C:11-3 and 2C:5-1; first degree robbery, N.J.S.A. 2C:15-1; second degree aggravated assault against Juan Carlos, N.J.S.A. 2C:12-1(b)(1); fourth degree aggravated assault against Juan Carlos, N.J.S.A. 2C:12-1(b)(4); fourth degree aggravated assault against Juan Battista, N.J.S.A. 2C:12-1(b)(4); and second degree possession of a handgun for an unlawful purpose, N.J.S.A. 2C:39-4(a).[2]
Defendant was tried before a jury and convicted of second and fourth degree aggravated *530 assault of Juan Carlos, and second degree possession of a handgun for an unlawful purpose. The jury acquitted defendant of first degree attempted murder, and was unable to reach a unanimous verdict with respect to first degree robbery and fourth degree aggravated assault of Juan Battista.
After merging the second degree aggravated assault against Juan Carlos with the second degree possession of a handgun for an unlawful purpose, the court sentenced defendant to a term of six and one-half years with an eighty-five percent period of parole ineligibility and a three-year term of parole supervision, both pursuant to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2.[3]
One of the issues raised by defendant in this appeal requires us to determine whether a series of communications between the trial judge and the jury, conducted without the knowledge and outside the presence of both the prosecutor and defense counsel, warrants reversal of defendant's conviction. Based on the record before us, which includes a verbatim account of the ex parte interactions between the judge and the jury, we discern no legal basis to reverse on this ground. Although counsel should have been present whenever the judge addressed or interacted with the jury in any manner, we are satisfied that the integrity of the jury deliberations was never compromised. The matters discussed by the judge with the jury concerned, for the most part, innocuous details unrelated to the charges against defendant.
Independent of, but related to, the propriety of these ex parte communications, defendant also argues that the judge's decision to permit the deliberating jurors to take home copies of sections of the court's instructions on the law over a weekend undermined the integrity of the deliberative process to such an extent as to require reversal of her conviction. The judge made this decision in the course of one of the ex parte communications with the jury.
This issue has not been addressed in a published opinion by any court in this State. Courts in other jurisdictions that have examined this issue have not found this practice improper. We now hold that, under the circumstances of this case, the court did not violate defendant's right to a fair trial or impugn the integrity of the jury's deliberative process by permitting the jurors to take copies of sections of the charge with them over a weekend. We nevertheless caution trial courts against engaging in such a practice without expressed authority and guidance from the Supreme Court.

I

A
At the time of the incident that gave rise to the charges against her, defendant resided with her disabled grandmother. Her mother had died approximately seven years earlier. At this point in her life, defendant appeared to have a promising future. She had recently graduated from the Emily Fisher Charter School and was in negotiations for a recording contract with Jive Records as a gospel music singer.
Juan Battista owned the grocery store known as Pollo Deli, located a short distance from defendant's grandmother's residence. His son Juan Carlos appears as the owner of the business on official documents. Juan Battista's nephew Miguel Moran worked in the kitchen of the store. Juan Battista is from the Dominican *531 Republic, and his ability to speak English is limited.
Defendant patronized Juan Battista's store almost every day from the time it opened in 2001, and was familiar with the people who worked there. She called Juan Battista "Mr. Martinez," and referred to Juan Carlos as "Carlos." She testified that Juan Battista always spoke to her in English and did not have difficulty communicating with her. She never had any problems with any of the men who worked there and never saw any weapons in the store.
At around 2:20 p.m. on November 24, 2005, defendant purchased a Boost phone calling card at Pollo Deli. Approximately thirty minutes later, defendant returned to the store to demand a full refund because the phone card was not working. Juan Battista testified that he told defendant the card was not refundable, and that any problems she had with the card had to be handled through the provider's customer service. Juan Carlos testified that defendant was arguing with his father in a "loud manner." Because he was on his cell phone at the time, Juan Carlos moved just outside the door of the store in order to continue talking.
Undeterred, defendant continued to demand that Juan Battista fully refund her money or "she was going to take 20 bucks worth" of merchandise from the store. When Juan Battista refused, defendant took five DVDs from the counter and attempted to leave the store. Juan Battista immediately yelled to his son to stop her. When he heard his father say defendant was stealing, Juan Carlos saw defendant emerge from the store with about five DVDs in her hands. Juan Carlos then put his phone back in its holster and grabbed defendant. He told her that he would not let her go unless she returned the DVDs.
At this point, Juan Battista came outside and took the DVDs from defendant's hands. Moran, who by this time had walked toward the entrance of the store to see what was happening, testified that he saw his uncle take the DVDs from defendant, and Juan Carlos turn his back to her. According to Juan Carlos, defendant then pulled out a silver .22 automatic handgun.[4] Juan Battista described the gun as a "revolver." Moran described it as a nickel-colored pistol, possibly a .22.
According to Juan Carlos, he then turned away from defendant to push his father out of the way. Defendant fired the weapon, shooting Juan Carlos in the back. Believing defendant had run away, Juan Carlos went inside the store to call the police on the landline and tell Moran he had been shot. He took the phone from Moran, took off his coat, laid facedown on the floor, and asked Moran to apply pressure to the wound so he could talk.
Juan Battista testified that defendant turned the gun on him after shooting his son. He hid behind a nearby vehicle until she left. He then went back in the store to call 911, but saw that Juan Carlos was already calling the police. Juan Battista *532 saw Moran apply pressure to Juan Carlos's wound until the paramedics arrived approximately two minutes later. Juan Carlos lost consciousness and woke up the next day in the hospital.

B
Defendant testified in her own defense. According to defendant, she went to Juan Battista's store that day to buy a phone card to call her family in the South. She had purchased phone cards before at Pollo Deli without incident. On the day in question, she purchased a 100-minute card for twenty dollars. When she attempted to use the card, she discovered that the number on the back of the card had already been scratched off. Defendant assumed the card was used, and, about thirty minutes after purchasing the card, walked back to the store to return it.
Defendant testified she first asked Juan Battista if she could have another card. When he refused, she requested her money back. She explained that the label on the back of the card had been removed and she believed the card was used. Juan Battista was not sympathetic; he told her that once she left the store with the card, it was no longer his problem. She again asked for a full refund of the purchase price to no avail. As a measure of crude justice, she grabbed some DVDs off the counter and said: "[W]ell, I'm going to take these DVDs if you don't give me my money back." When Juan Battista did not respond, she repeated her threat to take the DVDs two more times in a "high-pitched voice." Defendant testified, however, that she was not angry and did not lose her temper.
After she tucked the DVDs in her jacket, Juan Battista "reached under the counter," and took out a "small, silver gun," and pointed it at her. She then returned the DVDs to the counter and ran from the store. She heard Juan Battista yell something in Spanish to Juan Carlos, who chased after her and grabbed her when she was about five feet from the door. As Juan Carlos searched her pockets, she yelled: "Carlos, get off of me, get off of me, get off of me." At this point, Juan Battista came out of the store and pointed the gun at her. Then "the guy in the back" (presumably Moran), came out and said something to Juan Carlos in Spanish, prompting the latter to let go of defendant and walk back to the store.
At this point in the trial, defendant stepped out of the witness box to physically demonstrate for the jury what occurred next between her and Juan Battista. According to defendant, Juan Battista then "[took] the gun and start[ed] like [he was] going to jam it into me. And then I grabbed . . . the gun and push[ed]" it away because "I was afraid he was going to shoot me." When defendant pushed the gun, Juan Battista had his finger on the trigger. Defendant testified that when she pushed the gun away, "[a] shot went off." Feeling scared, defendant ran away to her home. On cross-examination, defendant testified she had never seen a gun before, even on television or in the movies, and was therefore unable to distinguish between a semi-automatic and a revolver.

C
When Trenton Police Officer Michael Schiaretti arrived at the scene, paramedics were already working on Juan Carlos. Schiaretti searched outside the store and did not find a weapon or shell casing. Trenton crime scene Detective Thomas Ertel searched for physical evidence inside and outside the store. He did not find a weapon or shell casings, and no fingerprints were found on the DVDs or counter.
*533 Trenton homicide Detective Edgar Rios arrived on the scene about fifteen minutes after Schiaretti. He remembered seeing a machete in the kitchen area of the store and a couple of bats behind the counter, but did not recall seeing a vehicle parked in front of the store. This seemingly unrelated detail is relevant because Juan Battista testified that he hid behind a vehicle to shield himself from defendant.
Raja Salem, a surgeon at Helene Fuld Hospital, was the physician who first treated Juan Carlos. He testified that Juan Carlos "did not have a detectable blood pressure," was "essentially gasping" for air, and was "very, very critically ill." Dr. Salem found a gunshot wound to the right ventricle of Juan Carlos's heart in line with the entry wound in his back. Blood was leaking around the heart, preventing it from pumping properly; his right lung also was injured. After surgery, Juan Carlos remained critical for twenty-four hours, after which time he stabilized and was released on December 1, 2005.
Frank Thompson delivered soda to Juan Battista's store the day after the shooting. As he exited his truck, he noticed a bullet casing on the ground near the store. He testified that he used a stick to pick up the casing, brought it inside, and gave it to Apolinar Jaquez, who was running the store in Juan Battista's absence. Jaquez gave the casing to the police.
The State called James Ryan as an expert witness. He is a Detective Sergeant First Class in the New Jersey State Police ballistics unit and an expert in firearms examination. Ryan examined the bullet removed from Juan Carlos and the shell casing found by Thompson. He opined that both came from a .25 caliber firearm. However, Ryan was not able to determine whether the casing was fired from a semi-automatic or a revolver. Although a .25 caliber bullet would not fit in a .22 handgun, both weapons may be similar in appearance.
Detective Rios interviewed Juan Carlos at the hospital five days after the shooting. He obtained a description of defendant and ascertained where she lived. From a photo array, Juan Carlos identified defendant as the person who shot him. He made this identification eight days after the shooting. Some time thereafter, Juan Battista and Moran made similar identifications.
On December 6, 2005, Trenton Detective Michael Termin went to defendant's home. Defendant answered the door and identified herself. Termin described her demeanor as very calm; Termin arrested defendant without incident. Detectives Termin and Rios returned to defendant's residence and, with defendant's grandmother's permission, searched defendant's bedroom; no relevant evidence was discovered.

II
From this record, defendant now appeals raising the following arguments:
POINT ONE
THE TRIAL COURT ERRED IN IMPEDING MS. MORGAN'S ABILITY TO CROSS-EXAMINE THE VICTIM. (Not Raised Below)
POINT TWO
THE TRIAL COURT IMPROPERLY EXCLUDED THE PRIOR CONVICTION OF A PROSECUTION WITNESS, THEREBY PREJUDICING MS. MORGAN'S RIGHT TO A FAIR TRIAL.
POINT THREE
PROSECUTORIAL MISCONDUCT DURING SUMMATION DEPRIVED MS. MORGAN OF HER RIGHT TO A FAIR TRIAL. (Partially Raised Below)
POINT FOUR

*534 THE TRIAL COURT ERRED IN ITS INSTRUCTION IN RESPONSE TO A QUESTION FROM THE JURY, THEREBY PREJUDICING MS. MORGAN'S RIGHT TO A FAIR TRIAL. (Not Raised Below)
POINT FIVE
THE TRIAL COURT ERRED BY ENGAGING IN EX PARTE COMMUNICATIONS WITH THE DELIBERATING JURY PANEL. (Not Raised Below)
POINT SIX
THE TRIAL COURT ERRED IN PERMITTING THE JURORS TO TAKE WRITTEN JURY INSTRUCTIONS HOME WITH THEM TO REVIEW OVER THE WEEKEND, THEREBY DEPRIVING MS. MORGAN OF HER RIGHT TO A JURY TRIAL. (Not Raised Below)
POINT SEVEN
THE TRIAL COURT'S FAILURE TO DECLARE A MISTRIAL AFTER THE JURY ANNOUNCED THAT IT COULD NOT REACH A VERDICT, AND THE COURT'S SUBSEQUENT COERCIVE SUPPLEMENTAL INSTRUCTION, WHICH ENCOURAGED THE JURY TO RETURN A PARTIAL VERDICT, VIOLATED MS. MORGAN'S RIGHT TO A FAIR TRIAL. (Not Raised Below)
POINT EIGHT
CUMULATIVE ERRORS DENIED THE DEFENDANT THE RIGHT TO A FAIR TRIAL. (Not Raised Below)
POINT NINE
THE TRIAL COURT MISAPPLIED ITS DISCRETION BY IMPOSING A MANIFESTLY EXCESSIVE SENTENCE BY FAILING TO CONSIDER APPLICABLE MITIGATING FACTORS. (Not Raised Below)
Argument points One through Four, Seven, and Eight lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2). The record shows the trial court correctly decided the evidential issues implicated in arguments Points One and Two. As to argument Point Three, the record shows that the prosecutor's remarks during the closing argument to the jury constituted fair commentary on the evidence presented at trial and did not in any way deprive defendant of her right to a fair trial. The argument reflected in Point Four is wholly without merit. The court's instructions to the jury in response to its question was a correct explanation of the legal principle involved. The arguments raised in Points Seven and Eight do not warrant further comment. Ibid.

A
We now turn our attention to defendant's Point Five, in which defendant argues, for the first time on appeal, that the trial court's ex parte communications with the deliberating jury constitute sufficient error as to warrant a new trial. Because defendant failed to raise this issue before the trial court, we review this argument under the plain error standard articulated in Rule 2:10-2. We are thus required to consider whether "the possibility of injustice [was] `sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached.'" State v. Taffaro, 195 N.J. 442, 454, 950 A.2d 860 (2008) (quoting State v. Macon, 57 N.J. 325, 336, 273 A.2d 1 (1971)). Applying this standard of review to the argument raised in Point Five, we discern no basis to set aside defendant's conviction.
Rule 1:2-1 requires, inter alia, that all trials be conducted in open court. As a corollary to this injunction, "proceedings that occur during [jury] deliberations . . . *535 [must] be recorded and conducted in open court, in the presence of the accused[.]" State v. Basit, 378 N.J.Super. 125, 131, 874 A.2d 1122 (App.Div.2005). In Guzzi v. Jersey Central Power & Light Co., 36 N.J.Super. 255, 264, 115 A.2d 629 (App. Div.), certif. denied, 19 N.J. 339, 117 A.2d 52 (1955), we determined that ex parte communications "between a trial judge in chambers and a jury engaged in deliberations in the jury room concerning any matter implicated ever so remotely in the consideration and decision of the case are forbidden by the essentials of our trial procedure as imperiling, perhaps, the principles of due process." Similarly, in State v. Brown, 275 N.J.Super. 329, 331, 646 A.2d 440 (App.Div.), certif. denied, 138 N.J. 269, 649 A.2d 1289 (1994), we held that "[a] judge should avoid engaging in any ex parte communications with the jury regarding its deliberations."
Despite the consistency and clarity of the message, we continue to confront the problem. We again emphasize that it is imperative for judges to "scrupulously avoid engaging in [their] own ex parte and unrecorded communications with the jury." Basit, supra, 378 N.J.Super. at 131, 874 A.2d 1122. We have expressed, and continue to express our disapproval, indeed outright condemnation, of such a practice "in the strongest possible terms." Id. at 134, 874 A.2d 1122.
However, while it is clear that ex parte communications between a judge and a deliberating jury are improper, "the distinction between those ex parte occurrences that require reversal and those that may be excused as harmless is not so clear." Ibid. Where the record does not reflect what transpired during the ex parte communication, reversal is necessary since reviewing courts are unable to determine whether the communication was prejudicial. Id. at 135, 874 A.2d 1122. Alternatively, "where the presence in the record of an adequate description of the ex parte proceeding may permit a reviewing court to determine that the presumption of prejudice has been dispelled," reversal is not necessarily required. Id. at 135-36, 874 A.2d 1122.
With these principles as our guide, we turn to the facts developed in this record. On March 3, 2008, the trial judge entered the jury room without counsel present and engaged in the following communication:
THE COURT: We won't be able to get that read-back done by 4:15 since that's when you would like to be excused.[5] I'll excuse you for the day and we'll have it ready for you tomorrow morning. So why don't you come tomorrow at 9:15 just so the court reporter can get set up. She's essentially reading back notes taken by another reporter.
A JUROR: Are you saying we can go in the courtroom at 9:15? If we wanted to review we can come at 9?
THE COURT: That's fine. Would you like the read-back even later than 9:15?
A JUROR: 10, 15 minutes before.
THE COURT: Then come at 9 and the read-back will begin at 9:15. I'm going to have another judge covering me. . . in the morning and expect to be back in the afternoon, but I'll be having a root canal so don't think I'm doing anything that's fun, but I can't put it off. I'll be talking a little funny, but those things happen. So there will be another judge and I'll bring him or her up to date on what's happening.
A JUROR: Back what time?
THE COURT: 9 o'clock

*536 A JUROR: But you'll be back
THE COURT: By the afternoon, I hope. Okay? Have a pleasant evening and, again, please don't discuss the testimony. Wait until all 12 of you are back tomorrow before you begin discussions again and avoid any outside information including newspaper articles. Thank you, and have a pleasant evening.
In our view, this ex parte colloquy, although clearly improper because it was not conducted in the presence of counsel, addressed only innocuous scheduling issues unrelated to the substance of the jury's function. Nothing in this communication could have caused the jury to reach a result it otherwise may not have reached.

B
The second ex parte communication between the judge and the jury occurred earlier in the deliberative process, and implicates defendant's argument in Point Six of this appeal. Specifically, in the course of this ex parte communication, the trial judge authorized the jurors to take with them over the weekend certain sections of the legal charge the judge had given to the jury before the start of deliberations. The matter unfolded as follows.
At the end of the first day of deliberations, the judge entered the jury room, apparently at the jury's request.[6] The following communication occurred:
FOREPERSON: Hello, Judge. Thank you for coming this afternoon. Would it be possible for us to take the explanations of attempt and robbery and theft home with us this weekend to read, or is that something that must remain in the room?
THE COURT: No jury has ever asked to do that.
FOREPERSON: We want homework. We're a studious group.
THE COURT: You know what, let me just check with the attorneys. Did somebody
SERGEANT-AT-ARMS: I think Bell said she was going to call.
THE COURT: I don't see any problem with it. I don't want you to take the verdict sheets home, but if you wish to take those homebut you can't look up any words in the dictionary or anything like that. You're limited to the four corners of those.

JUROR: It's kind of rough here. It's a lot to read at 4:00 in the afternoon.
THE COURT: You may, but bring them back, and as I said, don't look for definitions of any terms. If any need further definition, then you can ask me that. I told you during February we would not have off on Fridays and my calendar tomorrow is not pretty. So I would prefer that you come back on Monday unless you're opposed to that.
THE JURY: That's perfect.
THE COURT: Because I will have a courtroom full of people, and the movement just takes a while. So Monday, I think would be much more under control. So enjoy the weekend. Do not do any research, read anything, hear anything, discuss it at all until all of you are back Monday morning at 9:00. Okay.

(Emphasis added.)
Here, again, although the court's ex parte communication was improper, the presumption of prejudice was rebutted because the communication was preserved for appellate review. See Basit, supra, 378 N.J.Super. at 135-36, 874 A.2d 1122. *537 That being said, we infer from this record that the court did not advise counsel of the jury's request nor seek their input before acceding to it. This was clearly improper. Counsel must be consulted before the court responds to a question from the jury. State v. Whittaker, 326 N.J.Super. 252, 262, 741 A.2d 114 (App.Div.1999).
A court's failure to include counsel, however, does not automatically warrant the reversal of a defendant's conviction. Counsel's exclusion must be considered in the context of the question posed by the jury. If the jury's question calls for the judge to clarify a question of law or to read-back or replay the audio or video record of a witness's testimony or a part thereof, counsel's participation is crucial. In such a context, the attorneys' advocacy roles mandate that they be afforded the opportunity to argue in favor of or against the court's proposed response to the question. This is especially important when the question is ambiguous and requires further interaction with the jury to ascertain the nature and scope of the query. See State v. Graham, 285 N.J.Super. 337, 341-42, 666 A.2d 1372 (App.Div. 1995).
If the question concerns matters not directly related to the case, such as meal breaks or scheduling matters, (although counsel should always be included), the consequences for the failure to include counsel must be tempered by the lack of prejudice that results from the innocuous subject matter of the inquiry. Stated differently, we must assess the magnitude of the problem through a fact-sensitive analysis and on a case-by-case basis, and then craft a remedy that addresses and, to the extent possible, cures the prejudice caused by counsel's exclusion.
In this light, we return to the court's decision to permit the deliberating jurors to take over the weekend copies of the court's legal instructions concerning the charges of "attempt, robbery, and theft." We start by noting that pursuant to Rule 1:8-8(a), a trial court has the discretion to provide the jury with "a copy of all or part of its instructions" to take with them into the jury room for its consideration. (Emphasis added). The Supreme Court explained the purpose for this discretionary authority in State v. O'Brien, 200 N.J. 520, 541, 984 A.2d 879 (2009):
The purpose underlying Rule 1:8-8 is to authorize the judge to provide the jury with written instructions where it would be helpful. Deciding what to do requires an exercise of discretion based on the particular facts of the case. That does not include the adoption of a blanket rule regarding the provision of written instructions that the judge applies in every case. Thus, at trial, a judge should make an individualized decision regarding the submission of written instructions to the jury on the basis of what is before him and not on any preconceived policy rationale.
Furthermore, "[b]ecause the rule is silent regarding the kinds of considerations that should inform such a determination," the Court referred the matter "the Civil and Criminal Practice Committees for consideration of a more detailed standard to guide judges in exercising their discretion." Ibid.
The Court in O'Brien thus recognized that Rule 1:8-8(a) conferred upon trial judges a measure of discretionary authority over whether to provide written instructions to the jury that included denying a jury's specific request for the court to provide such written instructions. Implicit in the Court's decision to refer the matter to the Civil and Criminal Practice Committees was also the recognition of the numerous *538 possible scenarios applicable to this discretionary authority.
We must consider whether the discretionary authority in Rule 1:8-8(a) extends to the facts we confront here. A strict reading leans in favor of lack of authority because the Rule only permits the jury to take the court's written instructions into the jury room, not home with them over a weekend. No published decision in the State has addressed this issue.
Given the absence of explicit guidance from within our State, we look to see how other jurisdictions have addressed the subject. In People v. Ledesma, 39 Cal.4th 641, 47 Cal.Rptr.3d 326, 140 P.3d 657, 722 (2006), the California Supreme Court found that it was not error for the trial court to: (1) permit the foreperson to take the instructions home for review; and (2) instruct the jurors that they could think about the case while at home. The court noted that, although jurors may only deliberate when together, "it would be entirely unrealistic to expect jurors not to think about the case during the trial and when at home." Ibid.
A review of federal cases reveals a 2005 First Circuit case, in which the court found no error where the petitioners alleged that permitting the jurors to take their instructions home "made it likely that one or more jurors consulted a dictionary or other reference material while reviewing the instructionsa form of misconduct that in their view would amount to `structural error.'" McGonagle v. United States, 137 Fed.Appx. 373, 376 (1st Cir.), cert. denied, 546 U.S. 971, 126 S.Ct. 506, 163 L.Ed.2d 383 (2005).
The court explained that the petitioners' claim failed because
it is entirely conjectural. Petitioners have adduced no evidence suggesting that such consultation of extrinsic materials occurred. Nor is there any particular reason to suspect that the court's procedure significantly enhanced the likelihood of such an occurrence. For one thing, the concern voiced by petitioners is not limited to situations where jurors have been allowed to take a written charge home with them. Even if the charge had only been delivered orally, or even if a written charge had been distributed for use only in the jury room, the possibility would still arise that a juror would remember or write down specific words or terms to be researched at home. For another thing, while petitioners are correct that the court gave no cautionary instructions in this regard when delivering the written charge to the jury, it did give explicit such directives at the outset of trial. Although considerable time thereafter elapsed before the written charge was distributed, "appellate courts ordinarily presume that a jury will follow the trial judge's specific instructions." United States v. Bradshaw, 281 F.3d 278, 292 (1st Cir.2002). And the court instructed the jurors on the later date to follow "all of the instructions that I gave during the course of the trial" and to decide the case based "solely on the evidence received at at trial."
[Ibid.]
We reach the same conclusion here not only based on the compelling logic and commonsense observations of the court in McGonagle, but because, in contrast to what occurred in McGonagle, the trial judge here gave the jury specific cautionary instructions not to consult dictionaries or conduct any additional research concerning any matters relevant to the case. In the judge's own words, the jury was directed to stay within the "four corners" of the charge, and "not do any research, read anything, hear anything, discuss it at all until all of you are back *539 Monday morning at 9:00[a.m.]" As did the court in McGonagle, we too presume that juries will follow the court's instructions. See State v. Loftin, 146 N.J. 295, 390, 680 A.2d 677 (1996).
Finally, as a practical matter, the court's decision here did not prejudice defendant because the jury's request was limited to two specific offenses. The foreperson requested the court to permit the jury to take over the weekend "the explanations of attempt and robbery and theft. . . ."[7] The jury acquitted defendant of attempted murder, and was unable to reach a unanimous verdict on the charge of robbery. The court thereafter dismissed these two charges on the State's motion.
While this record does not warrant the reversal of defendant's conviction, we would be remiss if we did not comment on some of the problems inherent in the approach adopted by the trial court. As a threshold issue, the trial judge should have consulted with counsel before deciding whether to permit the jury to take any part of the charge with them outside the jury room, let alone over the weekend. After soliciting and considering counsel's views on the record, the judge should then have placed his or her decision on the record. These rudimentary tenets of due process are also sound principles of judicial management because they enable the creation of a proper and complete appellate record.
Although we do not discern a per se impediment to permitting the jury to take all or parts of the charge outside the jury room, we hasten to add that the better practice weighs against such experimentation. In our view, allowing jurors to take the court's instructions on the law outside the confines of the jury room leaves the deliberative process needlessly vulnerable to a variety of potential problems: it increases the chances that individual jurors may want to discuss these matters with family members or friends; given our ever expanding electronic capabilities, this practice makes it easier for jurors to research legal issues on their own; and some jurors may devote more time than others in poring through this material. This may disrupt the balance of the deliberative process, allowing the stronger, better "prepared" juror to potentially dominate the discussion.
Despite these misgivings, we have no evidence, direct or inferential, that anything untoward actually happened in this case. That is the reason we have opted not to disturb the jury's verdict, which is otherwise supported by competent evidence in the record. We caution trial judges, however, that the unintended, negative consequences that may flow from permitting such a practice outweigh the relatively minor disadvantage associated by disallowing it. As the Court did in O'Brien, we refer this issue to the Civil and Criminal Practice Committees to develop recommendations to the Supreme Court to either explicitly forbid the practice, or permit it under specific guidelines reflective of, but not limited to, the concerns we have highlighted here.

III
Defendant attacks the sentence imposed by the court as excessive because the court did not properly find and consider *540 certain mitigating factors. We disagree. Defendant was convicted of second degree aggravated assault, N.J.S.A. 2C:12-1(b)(1), a crime that carries a presumption of incarceration over a range of five to ten years, N.J.S.A. 2C:43-6(a)(2). After recognizing that this was defendant's first offense, the court nevertheless commented on the seriousness of the crime, characterizing her actions as "bold," "brazen," and "frightening." This suggested to the court that defendant was at risk for committing another offense, negating mitigating factors (8) and (9), N.J.S.A. 2C:44-1(b)(8), (9).[8]
The court found aggravating factor (9), N.J.S.A. 2C:44-1(a)(9), placing great emphasis on deterring this defendant and others similarly situated from committing this type of violent crime. Given defendant's lack of prior involvement with the law, the court found mitigating factor (7), N.J.S.A. 2C:44-1(b)(7). The court also acknowledged that defendant's grandmother would likely suffer due to her absence because defendant had been "very helpful and a blessing to [her] grandmother." It thus gave limited weight to mitigating factor (11), N.J.S.A. 2C:44-1(b)(11). Weighing these factors, the court concluded that a term of six and one-half years subject to NERA was warranted.
We review a sentence imposed by the trial court to determine whether the court: (1) followed the sentencing guidelines; (2) based its determination of aggravating and mitigating factors on credible evidence in the record; and (3) applied the guidelines in a manner that did not result in a sentence that shocks the judicial conscience. State v. Dalziel, 182 N.J. 494, 501, 867 A.2d 1167 (2005). Notwithstanding any perceived harshness in the sentence imposed, it is not our role to substitute our judgment for that of the trial court. See State v. Cassady, 198 N.J. 165, 180-81, 966 A.2d 473 (2009). We discern no legal basis to interfere with the sentence imposed by the court.
Affirmed.
NOTES
[1] Because these two men have the same last name, we will refer to them by their first names. We do this in the interest of clarity. No disrespect is intended.
[2] Although the record does not address this question, given defendant's age at the time of this incident, we presume the charges against her originated in the Family Part by way of a juvenile delinquency complaint, and were thereafter transferred to the Law Division, Criminal Part on the State's motion pursuant to N.J.S.A. 2A:4A-26.
[3] The State dismissed the two charges on which the jury could not reach a verdict.
[4] The trial was held in February 2008. When asked by the prosecutor whether he knew anything about guns, Juan Carlos testified that he was familiar with guns as a result of working for an armored truck company. He testified that he applied for a firearms purchaser's identification card on November 16, 2005, anticipating that he would need to own a weapon as part of his qualifications for the armored car position. However, he listed "deli owner" as his occupation on the firearm purchaser's application, and indicated that his purpose for obtaining a firearm was for business and life protection. After obtaining a firearms purchaser card on December 29, 2005, Juan Carlos purchased a .45 caliber handgun on March 17, 2006. He began his employment with the armored car company in May 2006.
[5] The record does not reflect the content of the note referred to here by the judge.
[6] The State's appellate brief indicates that neither defendant nor the attorneys were present during this exchange between the judge and the jury.
[7] Although the jury requested an explanation of theft, defendant was not charged separately with this crime; the court included a definition of theft as an element of the crime of robbery. See N.J.S.A. 2C:15-1. Relevant to this case, theft is defined as the unlawful taking or exercise of "unlawful control over, movable property of another with purpose to deprive him thereof." N.J.S.A. 2C:20-3(a).
[8] Despite this, the court did not find aggravating factor (3), N.J.S.A. 2C:44-1(a)(3).