11-570-cr
United States v. Esso

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term, 2011

(Argued: February 28, 2012      Decided: June 27, 2012)

Docket No. 11-570-cr

UNITED STATES OF AMERICA,

*Appellee*,

— v. —

GEORGE ESSO,

*Defendant-Appellant*,

PEGGY PERSAUD, ORETTE KILLIKELLY, ELTON LORD, RAFICK BAKSH, also known as Raffi, MAHAMOOD HUSSAIN, RAVI PERSAUD, CHEDDI GOBERDHAN, DAVID RAMNAUTH,

*Defendants.*[*]

B e f o r e:

WALKER, LYNCH, and DRONEY, *Circuit Judges*.

Defendant-appellant George Esso appeals from a judgment of conviction entered

by the United States District Court for the Southern District of New York (Scheindlin, *J.*),

---

[*] The Clerk of Court is respectfully requested to amend the caption as set forth above.

on February 4, 2011.  We hold that the district court did not err by allowing the members of the jury – after the beginning of jury deliberations and after receiving various cautionary instructions – to take the indictment home to read on their own time.  We accordingly AFFIRM Esso's conviction.

_____

DARRELL B. FIELDS, Federal Defenders of New York, Inc., New York, NY, *for Defendant-Appellant*.

REBECCA A. ROHR, Assistant United States Attorney (Iris Lan, Assistant United States Attorney, *on the brief*), *for* Preet Bharara, United States Attorney for the Southern District of New York, New York, NY.

_____

GERARD E. LYNCH, *Circuit Judge*:

Defendant-appellant George Esso was convicted, following a jury trial in the United States District Court for the Southern District of New York (Scheindlin, *J*.), of two charges arising from a mortgage fraud scheme.  On appeal, Esso argues that the district court erred by allowing the members of the jury – after the beginning of jury deliberations and after receiving various cautionary instructions – to take the indictment home to read on their own time.  For the reasons presented below, we affirm Esso's conviction.[1]

_____

[1] In a separate summary order filed today, we vacate Esso's sentence and remand for resentencing.

## BACKGROUND

On July 26, 2010, Esso and six other individuals were indicted for participating in a mortgage fraud scheme that operated from 2006 to 2007. The indictment charged Esso with conspiracy to commit wire and bank fraud, in violation of 18 U.S.C. § 1349, and with bank fraud, in violation of 18 U.S.C. § 1344. At Esso's trial, which was held from August 9 to August 26, 2010, the government presented evidence that the scheme operated through a mortgage brokerage, GuyAmerican Funding Corp. ("GuyAmerican"). As part of the scheme, GuyAmerican employees arranged loans by submitting false information to lenders, including false information regarding the supposed buyers' net worth, employment, income, and plans to live in the homes.

Esso was a loan officer in a branch office of GuyAmerican managed by Peggy Persaud.[2] In that capacity, Esso recruited buyers to purchase properties through GuyAmerican. According to Persaud's testimony at trial, none of the borrowers recruited by Esso fully qualified for the loans for which they applied, and all of their applications contained false information. One such borrower, Jonas Ake, did not have sufficient income to qualify for the loan amount that he needed to purchase two properties in which he was interested. With Esso and Persaud's assistance, Ake submitted loan applications for the two properties that (1) falsely stated that he had a second job at a restaurant owned

---

[2] Peggy Persaud is not related to Ravi Persaud, who was tried with Esso. All three were charged in the same indictment for their involvement with the scheme, but Peggy Persaud pled guilty and agreed to cooperate with the government.

by a GuyAmerican employee named Elaine Dixon and (2) overstated his income. One of the applications also falsely stated that Ake intended to use the property as his primary residence, when in fact the property was being purchased for Ake's sister, who did not plan to live in it and instead wanted it as an investment. Esso received commissions on Ake's purchases, and on several other loans that he arranged.

Jury deliberations began on August 25, 2010, at about 3:20 p.m. At 4:25 p.m., the jury sent two notes to the district court. The first informed the court that "[t]he jury has decided to leave today at 4:30," and that it planned to return "tomorrow morning at 10 a.m. to further deliberations." The second note asked whether the jury could "take the indictment home to carefully read." Esso's attorney opposed this request, stating that reading the indictment at home is "akin to deliberating" and "akin to asking to take exhibits home." He also objected that the indictment "serves as the government summation," and suggested that the jury could instead read the indictment the following day "when they are gathered together to deliberate." The attorney representing Esso's co-defendant said that his "only concern" was that if the jurors took the indictment home, "it would possibly tend to cause maybe some family discussions." The government did not object to allowing the jury to take the indictment home, so long as the jury was instructed not to discuss the indictment with family members or to deliberate outside the jury room.

After hearing these arguments, the district court told the jury that it could take the indictment home. However, the court instructed the jurors not to discuss the indictment with anyone or show it to anyone. Specifically, the court told them

4

not to show it to a spouse, not to show it to a grown child, not to show it to anyone. Just if you want to read it quietly, it's the same thing as reading it here in the jury room tomorrow morning at ten, it just saves some time. But you have to be able to follow that instruction.

Anybody have any doubt about being able to follow that instruction? Nobody has any doubt. OK.

The court also reiterated its previous instruction "not to do any research on your own," including research on the criminal defendant, the victim lenders, or the federal bank fraud statute. The court further instructed the jury not to "even think of going on the Internet" to research anything related to the case. After again asking whether any juror would "have any trouble following . . . these instructions," the court told the jurors that they could "take the indictment home, if you wish to read it carefully, to read it carefully overnight." At the request of Esso's counsel, the court also reminded the jurors of its previous instruction that "[a]n indictment is not evidence in any way. It's just a charge by the government."

The jury then took home a redacted version of the indictment that had been provided to them.[3] That version was twenty pages long, and contained sections that outlined the general mortgage fraud scheme, described the fraudulent preparation of particular loan applications, and summarized the various charges against Esso and his co-

---

[3] Esso has not suggested that the version of the indictment provided to the jury contained any misstatements or inaccuracies. Cf. United States v. Hernandez, 730 F.2d 895, 902 (2d Cir. 1984) (holding that "presenting the jury with an inaccurate copy of the indictment" was error, but harmless).

defendant. The jury began deliberations again the following morning. At about 2:55 p.m., the jury returned a verdict convicting Esso on all counts. Thereafter, on February 4, 2011, the district court sentenced Esso to one year and one day in prison.

**DISCUSSION**

We have long recognized that trial courts may, in their discretion, "permit[] the jury to take a copy of the indictment into the jury room, after taking care to instruct the jury that the indictment [is] not to be considered evidence." United States v. Giampino, 680 F.2d 898, 901 n.3 (2d Cir. 1982); see also United States v. Press, 336 F.2d 1003, 1016-17 (2d Cir. 1964) (holding that "it is not error to give the indictment to the jury for use during its deliberations," but noting the "particular importance" of giving proper limiting instructions regarding the indictment in such circumstances). Esso argues that he was denied his constitutional right to a fair trial when the district court allowed the jury to take home the copy of the indictment that had already been provided for use in the jury room. This is an issue of first impression in our court, and – so far as we are aware – in any federal or state court. Though we have doubts about the wisdom of the practice, and urge caution on district courts considering it, we conclude that, so long as jury deliberations have begun and appropriate cautionary instructions are provided, permitting the jury to take the indictment home overnight does not deprive a defendant of a fair trial.

It is certainly true, as Esso emphasizes, that "the jury system is meant to involve decisionmaking as a collective, deliberative process." United States v. Resko, 3 F.3d 684, 689 (3d Cir. 1993); see also United States v. Thomas, 116 F.3d 606, 619 (2d Cir. 1997)

6

(noting that "the deliberative process . . . lies at the heart of our system of justice").  Esso

claims that permitting the jury to take the indictment home to read

> encouraged the jurors to consider the case, not collectively with their fellow jurors, but on their own.  It invited the jurors to form their ideas about the case by themselves.  Therefore, the court[] . . . deprived [Esso] of the right to a proper jury verdict – one where the body of jurors reach their verdict in a collective, decisionmaking process.

Appellant's Reply Br. at 3.  Insofar as Esso is suggesting that it is inappropriate for

individual jurors to think about the case before them on their own time, we disagree.  We

see no harm in such private "deliberations," which may in fact enable jurors to participate

more thoughtfully in the collective process of reaching a verdict.  It would also, of course,

be "entirely unrealistic to expect jurors not to think about the case . . . when at home."

People v. Ledesma, 140 P.3d 657, 722 (Cal. 2006).  Thus, we reject the argument that

permitting the jury to take the indictment home was in error merely because it might lead

jurors to form "ideas about the case by themselves."

That is not to say that allowing the indictment to be taken home is without risk.

Sending trial materials home with jurors increases the chance of exposing the jury to

outside influences.  "Due process requires that the accused receive a trial by an impartial

jury free from outside influences."  Sheppard v. Maxwell, 384 U.S. 333, 362 (1966); see

also Manley v. AmBase Corp., 337 F.3d 237, 251 (2d Cir. 2003) ("Justice demands that

jurors 'decide the case solely on the evidence' before them, without any outside

influence." (quoting United States v. Olano, 507 U.S. 725, 738 (1993))).

7

As Esso notes, a court can control the jury's use of documents associated with the trial when the jury is in the jury room, and the jurors can monitor each other's compliance with the court's instructions. Once a juror leaves the courthouse, however, the court cannot ensure that the juror's family or friends "will not gain access to, and engage the juror in a discussion about," any materials that the juror has taken home. Appellant's Br. at 33. In the familiar surroundings of home, a juror might feel an understandable – albeit misguided – impulse to discuss trial materials with loved ones curious about the case that the juror had spent days or weeks hearing. And with documents from the trial immediately available for reference, a juror might also be more willing to engage in independent research on the facts or legal issues in the case on the internet.[4]

Moreover, permitting the jury to take home the indictment in particular raises yet another concern. As Esso argues, allowing the jurors to take the indictment home may "overemphasize[] its significance, since it is a one-sided presentation of the prosecution's view of the case." Id. at 35. Particular caution is required, as noted above, in instructing the jury about the legal significance of the indictment.[5]

---

[4] For these reasons, judges typically instruct jurors who have been permitted to take notes to leave their notes behind in the jury room when returning home in the evening.

[5] Indeed, while it is permissible, as we have noted above, to send the indictment into the jury room, the practice is hardly mandatory, and not all trial judges follow it, particularly when the indictment does not merely state the statutory charges against the defendant, but additionally contains a running narrative of the government's version of the facts of the case, including detailed allegations of facts not necessary for the jury to find in order to address the elements of the charged offenses. In most cases, the judge's instructions regarding the issues to be addressed by the jury and the elements of the offenses charged, which may

8

As we discuss further below, these considerations lead us to believe that district courts should not make a general practice of sending indictments home with the jury. Nonetheless, in light of the district court's clear and emphatic limiting instructions, we cannot say that the court committed a trial error – much less "structural error," see id. at 35 – by allowing the jurors to take the indictment home. As noted above, the court instructed the jurors not to show the indictment to or discuss it with anyone. The court also stressed that the jury was still bound by its earlier instruction not to conduct independent research, including research on the internet. And the court strongly reminded the jurors of the function of the indictment, and of their obligation under no circumstances to consider it evidence of the guilt of the accused.

There is no evidence even remotely suggesting that any juror disregarded these instructions. Absent such evidence, "we presume that jurors remain true to their oath and conscientiously observe the instructions and admonitions of the court." United States v. Rosario, 111 F.3d 293, 300 (2d Cir. 1997) (internal quotation marks omitted); see also United States v. Snype, 441 F.3d 119, 129 (2d Cir. 2006) ("[T]he law recognizes a strong presumption that juries follow limiting instructions."). While this presumption "can evaporate where there is an overwhelming probability that the jury will be unable to follow a limiting instruction that demands mental acrobatics of the jurors," Snype, 441 F.3d at 130 (internal quotation marks and alteration omitted), the instructions with respect

_____

include a reading of the legally effective portions of the indictment, will more than suffice to apprise the jury of the charges before them.

to the indictment were clear, uncomplicated, and in significant part a reiteration of instructions that the district court had previously given.

In the age of electronic information, there is already a significant risk that jurors will conduct research, given how easy it is to search online for a defendant's name or for a particular legal concept, just as there has always been a risk that jurors will be tempted to discuss the case, which consumes their daily attention, with family members and friends. The marginal additional risk created by allowing jurors to take home a copy of the indictment seems to us small compared to the risks that already exist due to modern technologies and the persistent features of human nature. Necessarily, the main protections against such dangers must be the district court's cautionary instructions and the honesty and integrity of the members of the jury.

The parties have identified, and our own research has uncovered, no appellate decision reviewing a trial court's decision to allow a jury to take home an indictment. However, our holding that such an action does not deprive a defendant of a fair trial if accompanied by appropriate cautionary instructions is consistent with cases allowing jurors to take home copies of jury instructions. For example, in People v. Ledesma, the California Supreme Court held that the trial court did not violate a defendant's right to a fair trial by allowing the jury's foreperson to take the jury instructions home after receiving cautionary instructions "not to discuss the instructions with anyone and . . . not to look up any words she did not understand." 140 P.3d at 722. On appeal, the Court rejected arguments similar to the ones made here:

> Defendant equates thinking about the case with jury
> deliberations. . . . Once the case has been submitted to the jurors
> for decision, they may not deliberate except when all are
> together. Although the deliberation process of course includes
> thinking, defendant has failed to cite any authority suggesting
> that jurors must be directed not to think about the case except
> during deliberations.

Id. (internal citation omitted).[6] In an unpublished decision, the First Circuit has likewise

rejected as "entirely conjectural" the argument that allowing the jury to take home the

jury charge "made it likely that one or more jurors consulted a dictionary or other

reference material while reviewing the instructions." McGonagle v. United States, 137 F.

App'x 373, 376 (1st Cir. 2005); see also State v. Morgan, 33 A.3d 527, 538-39 (N.J.

Super. Ct. 2011) (relying upon Ledesma and McGonagle and emphasizing that the trial

judge "gave the jury specific cautionary instructions not to consult dictionaries or conduct

any additional research concerning any matters relevant to the case"). These decisions

reinforce our belief that the district court's action did not deprive Esso of a fair trial.

While recognizing the special caution appropriate with respect to the handling of

indictments, we do not believe that the fact that the jury took the indictment home, rather

---

[6] Of course, it is within a judge's discretion to advise jurors to try to put the case out of their minds overnight, and some judges do so. Allowing the evidence and the parties' arguments to percolate for a while without conscious analysis may be more useful to some jurors than self-conscious pondering, and jurors, like anyone else, are entitled to a break from the hard mental work involved in deciding a case. But it is equally within the judge's discretion *not* to give such advice, which in any event is nothing more than that. As we have emphasized, jurors have every right, and in any event cannot be prevented, from thinking about the case during breaks in deliberation.

11

than the jury instructions, requires a different conclusion.[7]  In permitting the jurors to take copies of the indictment home to read, the district court did not give undue importance to that document.  The idea of taking the indictment home was proposed by the jury itself, not the district court.  The jury made this proposal after about an hour had passed on the first day of deliberations and at the same time that it notified the district court of its intention to finish deliberations for the day at 4:30 p.m.  The request appears to have originated from a desire to save time the following morning (and perhaps from a desire to impress upon the judge, by their willingness to do "homework," that the jurors' request to leave early and start relatively late the next day did not signal any lack of diligence), and the district court informed the jury that it was granting the request to allow them to save time.  See Special Appendix at 7 (stating that reading the indictment silently at home is "the same thing as reading it here in the jury room tomorrow morning at ten, it just saves some time").  Thus, the jury was unlikely to interpret the district court's decision to grant its request as a signal that it should place particular weight upon the indictment.  Indeed, the district court expressly reminded the jurors that the indictment did not constitute evidence.  There is no indication that the jury ignored that instruction, and, as noted above, we presume that the jury followed it.

---

[7] Permitting jurors to take home actual evidence – such as trial exhibits – may present greater risks to a defendant's right to a fair trial.  See United States v. Akpan, 407 F.3d 360, 369-70 (5th Cir. 2005) (noting "the general rule of this circuit that no material either introduced in evidence or excluded from evidence should be in the possession of members of the jury outside of the courtroom" and "caution[ing] any district court that considers making . . . an exception to the rule that adequate cautionary instructions and procedural safeguards must be present to ensure that an allowance of this kind does not so taint the trial process as to require a new trial" (internal quotation marks omitted)).

In considering the claim that the practice followed in this case is constitutionally forbidden, we are mindful of the great discretion accorded to trial judges to manage their own courtrooms, and of the desirability of allowing a measure of careful experimentation with trial management procedures that may at first appear undesirable simply because they are untraditional. Practices that were once controversial – such as permitting jurors to take notes – are now commonplace. Compare United States v. Davis, 103 F. 457, 470 (C.C.W.D. Tenn. 1900) (describing note-taking as "improper" and declaring that "[t]here is no protection against [its] dangers except to forbid the practice") with United States v. Bertolotti, 529 F.2d 149, 159 (2d Cir. 1975) (noting that "[i]t has been long established in this Circuit that it is within the trial court's discretion to allow the jury to take notes and use them in the course of their deliberations"); see also Leonard B. Sand & Steven Alan Reiss, A Report on Seven Experiments Conducted by District Court Judges in the Second Circuit, 60 N.Y.U. L. Rev. 423, 423-24 (1985) (describing a series of experimental procedures adopted by district judges that were designed to explore "ways of improving the work of juries throughout federal courts of the Second Circuit," including an experiment in which judges "affirmatively advis[ed] jurors that they may take notes" (internal quotation marks omitted)). We therefore hesitate to forbid new practices like the one involved in this case, particularly when undertaken for the salutary purpose of saving time for busy jurors and district judges.

Nonetheless, like the court in Morgan, we "hasten to add that the better practice weighs against" the experiment undertaken here. 33 A.3d at 539. Allowing the jury to

13

take home the indictment or the jury instructions "leaves the deliberative process needlessly vulnerable to a variety of potential problems" by "increas[ing] the chances that individual jurors may want to discuss these matters with family members or friends" and by "mak[ing] it easier for jurors to research legal issues on their own." Id. Accordingly, while we affirm Esso's conviction, our opinion should not be taken as a general endorsement of the practice of permitting the jury to take the indictment home. But the Constitution does not prohibit every practice that may appear of questionable value to appellate judges. We leave it to the wise discretion of trial judges to weigh the risks and benefits of this, as of other trial innovations, should the issue arise in cases before them.

## CONCLUSION

For the foregoing reasons, the Defendant-Appellant's conviction is AFFIRMED, and for the reasons stated in the accompanying summary order his sentence is VACATED and the matter is REMANDED to the district court for resentencing.