Ifeanyichukwu E. OKEKE, et al., Plaintiffs,

v.

The NEW YORK AND PRESBYTERIAN HOSPITAL, Defendant.

No. 16–cv–570 (CM)

United States District Court, S.D. New York.

Signed 09/21/2017

472

Anthony Chukwuka Ofodile, Ofodile & Associates, P.C., Osondu Ohuchukwu Anyadike, Smart Anyadike, PLLC, Brooklyn, NY, for Plaintiffs.

Ann Lee Knuckles Mahoney, Brian Gilbert Cesaratto, Jamie Fiedler Friedman, Stuart Michael Gerson, James Stuart Frank, Epstein Becker & Green, P.C., New York, NY, for Defendant.

## DECISION AND ORDER DENYING DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW AND GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR A NEW TRIAL

McMahon, C.J.:

Plaintiffs Ifeanyichukwu E. Okeke ("Okeke"), Jerry Baglione ("Baglione"), Iqbal Bajwa ("Bajwa"), Adel Mahmoud ("Mahmoud"), Naeem U. Qureshi ("Qureshi"), and Abel De La Trinidad ("De La Trinidad") (collectively, "Plaintiffs") brought this action against Defendant The New York and Presbyterian Hospital ("Defendant" or the "Hospital"), alleging, *inter alia*, claims of age discrimination and hostile work environment in violation of the Age Discrimination in Employment Act of 1967 (the "ADEA"), 29 U.S.C. § 623 *et seq.*; the New York Human Rights Law ("NYHRL"), N.Y. Exec. Law § 296 *et seq.*; and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Code § 8–107 *et seq.*[1] Following a nine-day trial, the jury found the Hospital liable on Plaintiffs' NYCHRL claims for age-related termination and denial of training opportunities, as well as for the creation of a hostile work environment based on age. The Hospital was not found liable on corresponding claims that were brought under federal and state law.[2]

The Hospital now moves for judgment as a matter of law, a new trial, or remittitur of damages. For the reasons below, the Hospital's motion for judgment as a matter of law is DENIED; its motion for a new trial is GRANTED IN PART AND DENIED IN PART; and its motion for remittitur is DENIED as moot.

### Background

The Court assumes the parties' familiarity with the facts and prior proceedings of this case.

Plaintiffs were all employed by the Hospital as laboratory technologists until they were fired, along with six others, in April 2015. Plaintiffs asserted at trial that they were fired on the basis of their age, that is, because they were over the age of forty. They also presented evidence that, prior to being fired, they were denied training opportunities that were given to younger employees and were subjected to a hostile work environment on the basis of their age.

The Hospital asserted that all twelve individuals who were fired (the six Plaintiffs plus two individuals over forty and four individuals under forty) were fired because an internal investigation revealed that they violated the Hospital's policies on reporting critical values (laboratory test results that indicate the presence of a life-threatening condition in the patient) and for falsifying patient records.

After trial, the jury returned verdicts in favor of Plaintiffs on their claims under NYCHRL for each Plaintiff's firing and

[1.] Plaintiffs brought additional claims that were dismissed on summary judgment or at trial, including claims of religious discrimination in violation of Title VII. (*See* Dkt. No. 117.)

[2.] Because "The law governing ADEA claims has been held to be identical to that governing claims made under the NYHRL," *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 106 n.6 (2d Cir. 2010), the Court charged only the federal- and city-law claims, not the corresponding state-law claims.

denial of training opportunities, and for the creation of a hostile work environment, but found for the Hospital on all other claims. The jury awarded Okeke $188,000 in back pay and $20,000 for emotional distress, Baglione $123,000 in back pay and $20,000 for emotional distress, Bajwa $196,000 in back pay and $20,000 for emotional distress, Mahmoud $125,000 in back pay and $20,000 for emotional distress, Qureshi $125,000 in back pay and $20,000 for emotional distress, and De La Trinidad $141,000 in back pay and $20,000 for emotional distress, but issued no awards for front pay or in punitive damages.

The Hospital now moves for judgment as a matter of law under Fed. R. Civ. P. 50, a new trial under Fed. R. Civ. P. 59, and for remittitur on damages.

### Discussion

I will first address the Hospital's motions insofar as they are addressed to Plaintiffs' termination claims under NYCHRL. I will turn to the motions addressing other claims later in this opinion.

### I. The Hospital's Motion for Judgment as a Matter of Law as to Plaintiffs' Firings Is Denied

██ A Rule 50 motion may only be granted "if there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded [persons] could not arrive at a verdict against [it]." *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 567 (2d Cir. 2011) (quoting *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 133 (2d Cir. 2008) (alterations in original)). "In assessing the sufficiency of evidence to support a jury verdict, [the Court] must view the record in the light most favorable to the opposing party, assuming all reasonable inferences were drawn and all credibility disputes resolved in its favor." *Advance Pharm., Inc. v. United States*, 391 F.3d 377, 390 (2d Cir. 2004).

██ Viewing the record in the light most favorable to Plaintiffs, and drawing all credibility determinations in their favor, I conclude that the Rule 50 motion must be denied as to Plaintiffs' termination claims. There is not a "complete absence of evidence supporting" the jury's conclusion that the decision to fire Plaintiffs from their positions as lab technologists was motivated at least in part by their age— which is the extremely lenient standard for establishing a claim of discrimination under NYCHRL. Plaintiffs presented evidence that, if believed, could have caused the jury to conclude that age discrimination was part of the reason that the Hospital decided to fire Plaintiffs. This means the verdict was not the certain product of "surmise and conjecture."

The investigation that ultimately led to Plaintiffs' firings began with an investigation of Samantha Bowie, a 28-year-old laboratory technologist who worked in the same laboratory as Plaintiffs. Bowie was accused of manually altering a patient's test result from a "critical value"—a test result that can indicate a life-threatening condition—to a non-critical value without justification. (*See, e.g.,* Tr. at 89:11–22.) Plaintiffs do not dispute that taking such an action without justification and without informing the patient's physician is a serious breach of Hospital policy that can justify firing the technologist.

The investigation into Bowie's behavior was initiated by Diane Mand, the technical chemistry supervisor at the Hospital's lab. Mand was also one of Plaintiffs' direct supervisors. Multiple witnesses testified that Mand had previously made disparaging, ageist comments about Plaintiffs on a

regular basis. (*See* Tr. at 221:18–222:16 (non–Plaintiff Arnel Cera); Tr. at 269:19–22 (Okeke); Tr. at 446:19–23 (De La Trinidad); Tr. at 495:08–19 (Baglione); Tr. at 628:05–24 (Bajwa).) Indeed, in May 2014, Plaintiff Okeke filed a formal complaint with the Hospital's human resources department alleging discrimination against older workers in the laboratory (PX–32), based in part on those comments. Mand denied having made such comments, but the jury was perfectly free to credit the testimony of the other witnesses over hers. The Hospital never acted on Okeke's complaint; the head of human resources testified that she had never seen it. (Tr. at 991:10–25.)

After Bowie was investigated and fired, the Hospital launched a broader investigation, which ultimately led to the firing of Plaintiffs and the other technologists. The Hospital took the position that Mand was not involved in this investigation or the decision to fire any of the Plaintiffs, so any discriminatory comments she might have made could not be connected to their termination. Mand herself testified that she had not been involved in the investigation of Plaintiffs. (Tr. at 134:01–03; 158:01–02.) Regwana Arin, who herself conducted the investigation by reviewing screenshots of the Hospital's computer system showing the tests run by Plaintiffs and the results they verified, did not indicate that Mand was involved in this process. (*See* Tr. at 824:05–10.)

However, the jury was free to discredit Mand's disclaimer. Charles Connelly, another Hospital employee, was asked to identify who, besides himself, "was involved in the investigation" of Plaintiffs; he said Mand was part of the team but not

Arin. (Tr. at 169:02–10.) Moreover, Arin (who testified she conducted the broader investigation) testified that Mand was her direct supervisor. (Tr. at 812:15–18.)

Assuming that the jury did not credit Mand's trial testimony and believed she had been involved in the broader investigation, the fact that she had expressed hostility to the Plaintiffs on the basis of their age (as many witnesses testified) was undoubtedly relevant to the jury's assessment of the reasons why the Hospital let Plaintiffs go.

The Hospital also asserted that the broader investigation it conducted after Bowie was fired included a review of every laboratory technologist's records, regardless of age, and that persons both over and under forty lost their jobs as a result. (*See* Tr. at 965:15–16.) However, Plaintiffs also presented some evidence that two younger laboratory technologists, Lea Verceles and Christine McCready, engaged in behavior similar to what Plaintiffs allegedly did, but were neither suspended nor fired. (*See* Tr. at 966:09–967:16.) And two of the four younger technologists who were fired along with Plaintiffs (Arnel Cera and Emily Cruz) testified that they were "outspoken" about what they perceived as mistreatment of the older technologists by Hospital managers—although the only formal complaints they signed made no mention of age discrimination. (*See* Tr. at 213:10–217:21 (Cera); Tr. at 236:12–15, 242:08–245:04 (Cruz).) This evidence, although not strong, could have caused the jury to infer that Cera and Cruz were fired at least in part because of their support for Plaintiffs, rather than because of any misconduct uncovered during the investigation.[3]

---

3. Indeed, Cera and Cruz, along with the two other older technologists who were fired, have filed their own lawsuit (currently pending before my colleague, the Hon. William H. Pauley) alleging that their firings were a result of age discrimination and retaliation for having spoken out against the Hospital's

The above-cited evidence is alone sufficient to preclude granting a Rule 50 motion in the Hospital's favor. However, there is more. Several of the Plaintiffs testified that the shift supervisors who reviewed their work each day had never written them up for failing to report a critical value (*see, e.g.,* Tr. at 578:09–21 (Qureshi); Tr. at 618:18–619:07 (Bajwa)); the jury might well have questioned why misconduct of this nature (which was described by the Hospital as dangerous and intolerable) could have gone undetected for so many years, only to surface a few months after Okeke had complained about age discrimination. (*See* PX–32.) Also, the Hospital did not introduce into evidence any records about the investigation, and the testimony of Hospital officials was inconsistent about whether any written report documenting the investigation of Plaintiffs was ever prepared. (*See* Tr. at 72:02–08; Tr. at 72:15–20; Tr. at 766:08–17; Tr. at 767:12–16; Tr. at 897:07–23.)

Finally, Plaintiffs presented some evidence that, during the course of the investigation, they were denied access to certain documents—referred to throughout the trial as "the printouts"—that they believed would have exonerated them.[4] The printouts to which they were admittedly not given access (*see* Tr. at 934:12–15) would, Plaintiffs testified, have shown that they had merely repeated a laboratory test whenever they encountered an analytical error, then manually entered the new, correct test results into the Hospital's computer system. (*E.g.,* Tr. at 279:03–07 (Okeke); 502:16–503:22 (Baglione); Tr. at 633:10–634:09, 688:10–21 (Bajwa).) Such actions, if true, would not have violated

Hospital policy. The Hospital's failure to provide them with records that would have demonstrated their innocence, Plaintiffs argued, was motivated by its desire to get rid of older employees who were complaining about age discrimination and otherwise causing trouble.

Plaintiffs' position from the inception of this lawsuit has been that the screenshots of the Hospital's computer system that were relied upon during the investigation do not tell the full story of what they did in connection with the disputed results. In addition to the electronic record of their activity captured by the screenshots—which show the tests conducted and verified that are associated with a particular "accession" number, or patient identification number—each analyzer created a hard-copy record (a "printout") of every test performed. Plaintiffs testified that, as part of their job, they had to review that printout and determine whether the test was valid (in which case it was their job to "verify" the results) or invalid (in which case the test needed to be repeated). One part of that assessment was seeing whether the test result had been "flagged" as erroneous by the analyzer. (*See* Tr. at 836:20–24.) According to Plaintiffs, the screenshots taken from the Hospital's computer system did not record any error flags that might have been generated, but the printouts did.

Plaintiffs further testified that, when samples were retested because of error flags, technologists might have to proceed using a "dummy label"—a label with a different accession number than was assigned to the sample when originally test-

---

treatment of older workers. *See Cera v. The N.Y. & Presbyterian Hosp.,* No. 17 Civ. 3163.

**4.** Although Plaintiffs argued this was evidence that the entire investigation was a "sham," at best their allegations would have demonstrat-

ed that the investigation was not fair and unbiased. There is no evidence, and no reasonable trier of fact could have concluded, that the investigation was manufactured out of whole cloth in order to get rid of Plaintiffs.

ed—and would therefore have to enter the test results manually in order to connect them to the correct patient. (*See* Tr. at 272:01–10, 274:11–25, 486:08–15.) None of that activity would be captured by the Hospital's computer system; only the hard-copy printout would show that a second test was conducted under a different accession number, and that the laboratory technologist manually entered that particular test result into the computer system. This is why, according to Plaintiffs, the hard-copy printouts that they requested were so crucial to exonerating them. Not only would the printouts show that they had encountered an error flag and had to run a second test, but they also would show the (non-critical) result of any second test that was run under a different accession number—neither of which would be known to a reviewer looking only at a screenshot of the Hospital's computer system.

The Hospital's principal investigator, Arin, testified extensively about the contents of these printouts. She insisted that there was no need to review them during the investigation because they would not, in fact, have exonerated the Plaintiffs of wrongdoing.[5] That said, on cross examination, Arin admitted that the printouts contained information not captured by the screenshots, including specifically the error flags that Plaintiffs claimed they relied on in deciding whether to retest the sample. (*See* Tr. at 822:01–06; Tr. at 838:14–20; *compare* PX–1 *with* PX–1A, PX–1B.) She also confirmed that, when a technologist encountered an error flag, he was to run a repeat test on the sample before going to a supervisor. (*See* Tr. at 963:22–

964:06.) She testified that a critical value test result that was invalid because of an error should not be verified by the laboratory technologist, and that unverified critical values need not be called to the patient's physician. (*See* Tr. at 963:22–964:01.) And she confirmed that, if a repeat test is performed using a dummy label, the result will not automatically appear on the Hospital's computer system and must be manually entered in order to become associated with the correct patient accession number. (Tr. at 973:12–14.)

Most importantly, Arin confirmed Plaintiffs' testimony that the only way to verify whether a repeat test had been performed using a dummy label would be to examine the hard-copy printout generated by the analyzer at the time the test was run. (Tr. at 973:15–18.)

Of course, the fact that there are differences between the content of the screenshots and the content of the printouts does not necessarily lead to the conclusion Plaintiffs wanted the jury to reach: that the investigation was biased against them from the start because of their age. Indeed, the one time Plaintiffs tried to show how the printouts would have exonerated them, they failed to show anything of the kind. Plaintiff Okeke testified that, in one particular instance, he had conducted a repeat test using a dummy label, obtained a non-critical result, and entered that result into the system. However, the printout that corresponded with the test about which Okeke testified did not show any test yielding the non-critical value that Okeke manually entered. (*See* PX–2; PX–2A; PX–3; PX–3A.) Okeke was reduced to tes-

5. Arin gave inconsistent testimony about whether she reviewed printouts as well as screenshots during her investigation. First she said that she did not (Tr. at 824:14–19), later she said that she did (Tr. at 923:20–24), and finally she testified that she reviewed some printouts but not ones associated with every allegedly fabricated test result (Tr. at 933:19–22). Connelly, the individual who pulled all the records for the investigation, flatly stated that analyzer printouts were not relied upon by the investigation team. (Tr. at 178:12–13.)

tifying that some other printout must contain the results of this test. (*See* Tr. at 282:16–284:06.)[6] His testimony proved nothing about the potential usefulness of the printouts in any specific instance where falsification was alleged and undercut the force of Plaintiffs' principal argument.

However, the combination of circumstances described in the preceding pages could have led a reasonable jury to question the Hospital's claim that there was no need to examine evidence beyond the admittedly incomplete screenshots in connection with the investigation. While the jury was instructed that the Hospital's business decisions (one of which was how to conduct an investigation into potential wrongdoing) were not on trial, and that the Hospital was privileged to believe the results of the investigation it did conduct, the jury—having heard considerable evidence about age-related comments and indifference to complaints of age discrimination—might well have concluded that the Hospital's failure to give Plaintiffs every opportunity to defend themselves during the course of that investigation reflected some desire to get rid of them because of their age—even if that was not all that was at work.

In short, there is not a "complete absence" of evidence the in record that could support a reasonable jury's verdict against the Hospital on the termination claims under NYCHRL.

The Hospital nonetheless argues that the jury's return of verdicts in its favor on Plaintiffs' ADEA termination claims means that the jury necessarily concluded that the Hospital's stated reason for firing

Plaintiffs was not pretext for discrimination, and is therefore irreconcilable with the verdicts for Plaintiffs on their NYCHRL claims. That argument is premised on the Hospital's refusal to acknowledge the significant differences between federal law and NYCHRL when it comes to age discrimination.

■ When faced with an apparent inconsistency between a jury's verdicts, "a reviewing court must adopt a view of the case, if there is one, that resolves any seeming inconsistency." *Harris v. Niagara Mohawk Power Corp.*, 252 F.3d 592, 598 (2d Cir. 2001) (quoting *Brooks v. Brattleboro Mem'l Hosp.*, 958 F.2d 525, 529 (2d Cir. 1992)). Such a view is possible here.

■ As the Court explained in the jury instructions—to which the Hospital did not object and which it does not now challenge—a jury deciding whether there was age discrimination must answer two separate questions in determining whether an employer's stated non-discriminatory reason for an adverse employment action was, in fact, a pretext for discrimination. The first question is whether the reason given by the employer for taking the action that it took is false; the second reason is whether discrimination was the real reason. "[A] reason cannot be proved to be 'a pretext for discrimination' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (emphasis added). That is true under both federal and city law.

---

6. Plaintiffs have argued over and over again that the Hospital has withheld evidence—specifically, printouts—that were called for in discovery. This issue was litigated before Chief Magistrate Judge Debra C. Freeman, who supervised discovery in this case. She found that the Hospital had complied with its discovery obligations. (*See* Dkt. Nos. 53, 60, 69.) This would seem to eviscerate any suggestion that missing printouts would confirm Okeke's story when the printouts that were produced by the Hospital did not. Okeke's "testimony" on this point is entirely speculative and so must be discounted.

But whether discrimination was the "real reason" for the adverse employment action is evaluated differently depending on whether the claim is brought under the ADEA or under NYCHRL. *See Colon v. Trump Int'l Hotel & Tower*, No. 10 Civ. 4794, 2011 WL 6092299, at \*5 (S.D.N.Y. Dec. 7, 2011). Under the ADEA, discrimination must have been the "but for" cause of the adverse employment action in order for the plaintiff to prevail—that is, if not for age discrimination, the employer would not have made the decision. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009). Under NYCHRL, however, a plaintiff may prove his case if he "proves that unlawful discrimination was one of the motivating factors, even if it was not the sole motivating factor, for an adverse employment decision." *Melman v. Montefiore Med. Ctr.*, 98 A.D.3d 107, 127, 946 N.Y.S.2d 27 (1st Dep't 2012).

It is possible to reconcile the jury's verdicts on the ADEA and NYCHRL termination claims because the jury obviously concluded that more than one factor was at work, and that age—while not the "but for" cause of the decision to fire Plaintiffs—was one of several motivating factors.

The Hospital insists that, on the evidence presented, the jury could not reasonably have so concluded because Plaintiffs refused to acknowledge the existence of any legitimate basis for their firings, choosing instead to focus their case on attacking the integrity of the Hospital's investigation. The Hospital cites *Abdallah v. Napolitano*, 909 F.Supp.2d 196, 214 (W.D.N.Y. 2012), for the proposition that the plaintiff must explicitly acknowledge the existence of some other legitimate basis for termination in order to prevail in a mixed-motive case.

Neither *Abdallah* nor any other law requires a plaintiff bringing a discrimination claim under NYCHRL to make such an acknowledgement. First, *Abdallah* was a summary judgment decision in a Title VII case, which alone distinguishes it from the case at bar, where the question is whether to overturn the jury's verdict on claims brought under NYCHRL. Second, in *Abdallah*, the court determined that, "The undisputed facts establish that plaintiff was terminated from his employment as a direct consequence of his refusal" to cooperate with an internal DHS investigation by being interviewed, 909 F.Supp.2d at 207, and that the plaintiff had failed "to come forward with *any evidence* from which a factfinder could rationally conclude that [the employer's] stated reasons for discharging him were false," *id.* at 210 (emphasis added). Here, as discussed, the jury had evidence available that, if credited, could have allowed it to conclude that the Hospital's stated reason for firing Plaintiffs was not, in fact, the only reason for its decision, even though it was unquestionably part of the reason (perhaps even most of the reason) why they were fired.

Finally, the *Abdallah* court's discussion of mixed-motive analysis (which only came up on reconsideration) does not support the Hospital's argument. After thoroughly reviewing the standards for mixed-motive cases, the court held that the plaintiff had offered no evidence "that might reasonably be expected to show that the decision to terminate him was partly motivated by illegitimate reasons." *Id.* at 214. In that discussion, the *Abdallah* court cited to the Second Circuit's decision in *Holcomb v. Iona Coll.*, 521 F.3d 130, 142 (2d Cir. 2008), where the court held that a Title VII plaintiff asserting that discrimination was a, but not the only, motivating factor in his firing could establish his case *without* proving that the employer's stated reason was false.

*Holcomb* is on all fours with this case; the jury accepted that the Hospital actually concluded, after its investigation, that Plaintiffs had violated Hospital policy; but the jury also concluded that the investigation was unfairly tainted by age discrimination, such that age was a motivating factor in their firings.

The Hospital cites to no case in which a court has overturned a jury's verdict on a NYCHRL claim and entered judgment for a defendant because the plaintiff failed or refused to acknowledge that there might be legitimate reasons for his termination in a mixed-motive analysis. Instead, the Hospital cites to cases where the court decided on summary judgment either that (1) the plaintiff had offered *no evidence* that the defendant's stated reason for the adverse employment action was not the sole reason for the decision, *see Gonzalez v. EVG, Inc.*, 123 A.D.3d 486, 487, 999 N.Y.S.2d 16 (1st Dep't 2014); *Kaiser v. Raoul's Rest. Corp.*, 112 A.D.3d 426, 427, 976 N.Y.S.2d 59 (1st Dep't 2013), or (2) the plaintiff had failed to even establish a prima facie case, *see Holleman v. Art Crating Inc.*, No. 12 Civ. 2719, 2014 WL 4907732, at *36 (E.D.N.Y. Sept. 30, 2014); *Rodriguez v. City of New York*, No. 09 Civ. 1378, 2011 WL 3610751, at *9 (E.D.N.Y. Aug. 16, 2011), *aff'd*, 484 Fed.Appx. 637 (2d Cir. 2012). These cases are not relevant to the analysis required on this motion.

It would be particularly harsh to conclude that an employer could obtain judgment notwithstanding a jury's verdict of age discrimination under NYCHRL merely because the plaintiff failed to explicitly acknowledge at trial the potential existence of other non-discriminatory motivations behind the employer's decision, because such an acknowledgement would necessarily hinder the plaintiff's parallel claim under the ADEA. By acknowledging the existence of other potential motivations, the plaintiff would have to weaken—or even doom—his federal claim, which depends for its force on proving that age discrimination was the "but for" cause of his firing. Placing the burden of producing these other contributing factors on the plaintiff would undermine the "uniquely broad and remedial purposes" of NYCHRL, "which go beyond those of counterpart state or federal civil rights laws." *Bennett v. Health Mgmt. Sys., Inc.*, 92 A.D.3d 29, 34, 936 N.Y.S.2d 112 (1st Dep't 2011) (quoting *Williams v. New York City Hous. Auth*, 61 A.D.3d 62, 66, 872 N.Y.S.2d 27 (1st Dep't 2009)).

The Hospital's final argument is that, because Plaintiffs failed to prove that age was the "but for" cause of their firings, the Hospital has necessarily established an affirmative defense that it would have fired Plaintiffs irrespective of the potential discrimination. The Hospital waived its right to make this argument.

■ Under the mixed-motive framework used in Title VII cases, if a jury finds that discrimination was a motivating factor in the adverse employment action, the employer may still prevail "if the jury finds that, irrespective of the prohibited discrimination, it would have taken the same action for other reasons." *Donovan v. Milk Mktg. Inc.*, 243 F.3d 584, 585 (2d Cir. 2001). Under that analysis, "the employer has the burden of persuasion" on this mixed-motive affirmative defense. *Id.* at 586.

But assuming that the mixed-motive affirmative defense is available in NYCHRL cases—a proposition for which Defendants cite no authority—the argument fails because this jury was never asked to make any finding about such an affirmative defense. The Hospital never sought a jury finding on whether it had established the defense, did not request a jury instruction on the issue of affirmative defenses (in-

cluding the burden of proof on such a defense, which would, of course, have rested with the Hospital), and did not object to the charge as given, which included no such instruction. Any objection to the absence of such a charge is thus unpreserved. *See* Fed. R. Civ. P. 51. Since the jury was not asked to consider whether the Hospital had established any mixed-motive affirmative defense, I can hardly read such a finding into its verdict on the ADEA termination claims.

Accordingly, the Hospital's motion for judgment as a matter of law as to the NYCHRL claims arising from Plaintiffs' firings is DENIED.

## II. The Hospital's Motion for a New Trial on Plaintiffs' Termination Claims Under NYCHRL Is GRANTED

Entirely separate from the Hospital's Rule 50 motion is its motion for a new trial under Fed. R. Civ. P. 59(a). The standard on such a motion is considerably different than the standard for granting judgment as a matter of law, and the Hospital has a much lower hurdle to surmount.

 A new trial under Rule 59(a) "may be granted even if there is substantial evidence supporting the jury's verdict, and . . . a trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner." *Manley v. AmBase Corp.*, 337 F.3d 237, 244–45 (2d Cir. 2003) (quoting *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 133–34 (2d Cir. 1998)); *see* Fed. R. Civ. P. 59(a). To order a new trial on this basis, the Court must conclude that " 'the jury has reached a seriously erroneous result or . . . the verdict is a miscarriage of justice,' " that is, "it must view the jury's verdict as 'against the weight of the evidence.' " *Manley*, 337 F.3d at 245 (alterations in original) (internal quotation

marks omitted) (quoting *DLC Mgmt. Corp.*, 163 F.3d at 133). In making this determination, the Court is "free to weigh the evidence and the credibility of the witnesses," *Rocco v. Long Island R.R.*, 411 F.Supp.2d 185, 196 (E.D.N.Y. 2006), although "[a] jury's credibility assessments are entitled to deference," *Pouncy v. Danka Office Imaging Co.*, No. 06 Civ. 4777, 2009 WL 3415142, at *1 (S.D.N.Y. Oct. 22, 2009) (quoting *United States v. Landau*, 155 F.3d 93, 104–05 (2d Cir. 1998)).

 It is this aspect of the Hospital's motion that has given the Court the greatest difficulty, especially since both sides intermingle their (relatively brief) discussion of the Rule 59 motion with the Rule 50 motion in their papers. In the end, and after a painstaking review of the evidence and the absence of evidence, I conclude that the Rule 59 motion should be granted as to Plaintiffs' NYCHRL termination claims.

As discussed above, the jury's divergent verdicts under the ADEA and NYCHRL mean that the jury must have concluded that the Hospital decided to fire Plaintiffs in part because of its investigation and in part because of unlawful age discrimination. The evidence was not so overwhelmingly in the Hospital's favor as to require reversal of those verdicts and entry of judgment in the Hospital's favor.

That said, the *weight* of the evidence demonstrates that age did *not* play a role in the Hospital's decision to fire Plaintiffs.

Plaintiffs offered no direct, non-conclusory evidence that age played any role whatever in that decision. Aside from the participation of Mand in the investigation, the evidence of a hostile work environment (which was more than sufficient for a finding in Plaintiffs' favor on that claim) could not be connected to any of the investigators or decision-makers, or to any particu-

lar decision made by the Hospital. The fact that Plaintiffs and their allies opined that they must have been fired because of their age does not make it so.

There is considerable evidence supporting the Hospital's position that it fired Plaintiffs for non-discriminatory reasons.

There is no dispute that the investigation commenced because of the actions of Bowie, a 28–year-old laboratory technologist, and that it grew to cover every technologist in the lab—those over and under forty alike. Of the twelve individuals ultimately fired, four (including Bowie) were under forty years old. There is no evidence to even suggest that this investigation was initiated for the purpose of separating the Plaintiffs from their jobs; nothing in the record supports the claim that this was, in Plaintiffs' words, see supra note 4, a "sham" investigation. And Plaintiffs themselves acknowledge that, because each screenshot identified by the Hospital shows both an initial test result returned by the analyzer and a manual entry verified by the technologist with a different value, it would appear, from a review of the screenshots alone, that they had falsified data.

As noted above, the essence of Plaintiffs' claim is that the investigation was tainted by age discrimination because they were not given access to documents that would have exonerated them. But even under the lenient standard of NYCHRL, there must be some evidence tying that denial of access to Plaintiffs' age. There is no evidence that a decision was made by anyone to deliberately not turn over the printouts because of the Plaintiffs' age. Nor is there any evidence that any individual under forty was given access to such evidence—which, if true, would be some evidence that the investigation was conducted in a discriminatory manner.

Finally, as discussed above, while Plaintiffs stated their belief that the withheld evidence would have exonerated them, and while counsel argued vociferously that it would have exonerated them, the only time Plaintiffs tried to back up their theory with proof, they failed utterly. Moreover, Arin, whose testimony I find to be credible,[7] testified that it would take at least eight to ten minutes to run a repeat test using a dummy label and manually enter the result. Yet the record demonstrates that, on some occasions, Plaintiffs manually verified non-critical value results within two or three minutes after receiving the original critical value result. (See Tr. at 819:18–820:15, 828:18–04.) Using printouts (not screenshots), Arin demonstrated that Plaintiff Okeke had manually verified a test result so quickly that the machine had not even completed an automatic retest of the sample. She also demonstrated, again using a printout, that Okeke had verified a different value than the machine had returned—a non-critical rather than a critical value—which led her to conclude that he had falsified the result. (See Tr. at 835:21–842:01.)

In short, while Plaintiffs conjecture that the printouts would have exonerated them, the weight of the evidence is to the contrary.

Significantly, Arin testified that final decision to fire Plaintiffs was made by the human resources department, not by anyone in the Hospital's laboratory. (See Tr. at 964:07–965:01.) Mand worked in the lab-

---

7. As noted above, in deciding a Rule 59 motion, the Court is free to weigh evidence and consider credibility, so long as it gives appropriate deference to the jury's findings on the credibility of witnesses. There is nothing in the jury's verdict to suggest that it did not credit Arm's testimony, and its rejection of Plaintiffs' federal claims strongly suggests that the jury did believe her testimony.

oratory, not in human resources. Moreover, there is no evidence that the human resources team was aware of her ageist comments; the only complaint of age discrimination made by Plaintiffs before they were fired occurred almost a year earlier, and it does not mention Mand by name. (*See* PX–32.) Therefore, the decision to fire Plaintiffs is sufficiently divorced from the evidence of a hostile work environment in the record.

Arin also testified that every person who was found to have violated Hospital policy by altering critical test results was fired, regardless of age. (*See* Tr. at 964:07–965:01.) That means eight individuals over forty were fired and four individuals under forty were also fired. And while two of the four younger individuals had previously allied themselves with the Plaintiffs' complaints of age discrimination in the lab, there is no evidence that the other two younger employees did so—which negates, or at least seriously undercuts, retaliation as a theory for why the younger employees were fired along with the older ones.

All of this evidence relates directly to the specific 2015 investigation that resulted in Plaintiffs' termination. The jury obviously credited that Plaintiffs were fired at least in part because of the Hospital's belief, following the investigation, that they had falsified test results—otherwise it would have found for Plaintiffs on the ADEA claims as well. All this evidence, combined with the lack of any direct evidence of age discrimination in the conduct of the investigation with Plaintiffs' firings, suggests that the jury's verdict on the NYCHRL termination claims is against the weight of the evidence.

There is, of course, evidence in the record suggesting otherwise—the Rule 50 motion would have been granted if there

were not—but that evidence is sparse and does not outweigh the evidence favoring the Hospital.

The potentially most damning evidence against the Hospital is the fact that two younger technicians manually entered test results but were not fired. (*See* Tr. at 281:06–12; Tr. at 966:09–967:16.) On cross examination, Arin admitted that a technician named Verceles was counseled about manually entering a single test result, but was not fired or suspended. (Tr. at 966:09–12.) However, there is no evidence that Verceles *altered* the test result from critical to non-critical, which is what got the other technologists fired; Arin said only that she entered a test result manually. Furthermore, there is no evidence that this incident was uncovered during the investigation that resulted in the termination of Plaintiffs (*see* Tr. at 966:06–08), so it is at best weak evidence of differential treatment.

Potentially more troubling is Arin's testimony that a technician named McCready verified a manually entered result that was changed from a critical value to a noncritical value (*see* DX–19 at DNQ000276), but was not the subject of further investigation. (*See* Tr. at 966:24–967:16.) It appears that this verification was uncovered as part of the investigation that underlies this case; it was reflected in a screenshot reviewed by Arin, (*See* DX–19.) However, Arin explained, using the screenshot, that McCready did not manually enter the altered value; Plaintiff Qureshi did. McCready merely verified the result that Qureshi had entered, which would have appeared to her to be a legitimate test result. (*See* Tr. at 876:06–877:19.) Since it was the *alteration* of results from critical to non-critical, on multiple occasions,[8] that

---

8. Okeke was found by the Hospital to have falsified at least 29 entries, Bajwa at least 20,

Baglione at least 15, De La Trinidad at least

resulted in the twelve terminations, this incident does not weigh heavily against the evidence that the results of the investigation, rather than anything having to do with Plaintiffs' age, was the reason they were fired.

Similarly unilluminating is the failure of the Hospital to produce a final report of the results of its investigation, a point on which Plaintiffs place great emphasis. Sloppy personnel practices are not evidence of discrimination, and there is no evidence that the lack of a report related to the Plaintiffs' age—indeed, the lack of a report, to the extent that it has any impact on anything at all, was every bit as impactful on the four younger employees who were fired as it was on the eight older employees who were fired.

The direct evidence of a hostile work environment in the record is also completely disconnected from the firing of Plaintiffs.

As discussed below, there is more than sufficient evidence to sustain the jury's verdicts that Plaintiffs experienced a hostile work environment at the hands of their supervisor Mand: multiple witnesses testified that she made numerous disparaging age-related remarks about Plaintiffs. But even viewing the evidence most favorably to Plaintiffs (which I am not required to do under Rule 59), the record shows that Mand played a small role (limited to the charges against Bowie) in the investigation that ultimately led to Plaintiffs' firing, and there is no evidence that she either was the final decision-maker in the case of Plaintiffs or had any influence over the final outcome. Mand admittedly conducted the initial investigation into Bowie but insisted that she then ceased to be involved. Plaintiffs attempted to impeach her with deposition testimony that allegedly contra-

dicted her trial testimony; but the deposition testimony was actually consistent with Mand's trial testimony:

Q. [W]as there any allegation that alleged that [P]laintiffs altered lab test results?

A. Yes.

Q. When was that allegation made?

A. One instance with Samantha Bowie.

Q. I am asking you about timing. I am asking you when.

A. I don't know the date.

A. I would say the year would be 2015. That is all I can say.

Q. Based on that report, what did you do, to your knowledge?

A. I conducted an investigation.

. . . .

Q. You conducted it alone or in conjunction with any other person?

A. I conducted it alone.

(Tr. at 135:18–136:09.) Connelly's testimony that Mand but not Arin was involved in the investigation is consistent with Mand's if we are dealing only with the investigation of Bowie. If it was intended to relate to the broader investigation that ensnared Plaintiffs, Connelly's statement is incredible, because it is contrary to every other piece of evidence in the case, a fact of which I can take account on a Rule 59 motion (but not on a Rule 50 motion).

For these reasons, the jury's conclusion that age discrimination played a role in the Hospital's decision to fire Plaintiffs, while not entirely unsupported, goes against the weight of the evidence presented at trial. Accordingly, the Hospital's motion for a new trial on the NYCHRL termination claims is GRANTED.

43, Mahmoud at least 18, and Qureshi at least

35. (Tr. at 825:10–24.)

## III. The Hospital's Remaining Motions Are Denied

### A. The Hospital's Preemption and Arbitration Arguments are Meritless

The Hospital moves under Rule 50 for judgment as a matter of law on Plaintiffs' claims related to training and a hostile work environment under NYCHRL, arguing that these claims are preempted by Section 301 of the Labor Management Relations Act of 1947 ("LMRA"), 29 U.S.C. § 185. It also argues that these claims should have been subject to mandatory arbitration. Both of these arguments are without merit.

 The arbitration argument, raised now for the first time after conclusion of trial, is waived. As the Second Circuit has explained, "a party waives its right to arbitration when it engages in protracted litigation that prejudices the opposing party." *In re Crysen/Montenay Energy Co.*, 226 F.3d 160, 162 (2d Cir. 2000) (quoting *PPG Indus., Inc. v. Webster Auto Parts Inc.*, 128 F.3d 103, 107–08 (2d Cir. 1997)). Here, the Hospital failed to move to compel arbitration *at any point* during the litigation—even now, it only raises the issue in a post-trial motion, not in a motion to compel arbitration. There is no question that any such motion would be untimely at this juncture.

 The preemption argument was previously raised in both the Hospital's answer and before and during trial. Section 301 of the LMRA preempts state-law claims where resolution of the claims requires interpretation of the terms of a collective bargaining agreement ("CBA") governing the plaintiff's employment. *See Single v. Norge Div. of Magic Chef Inc.*, 486 U.S. 399, 410, 108 S.Ct. 1877, 100 L.Ed.2d 410 (1988). The Court granted the Hospital's Rule 50(a) motion during trial

as to the aspects of Plaintiffs' age-discrimination claims related to the denial of overtime opportunities, because the CBA does govern the assignment of overtime, which must be done through a seniority system. (*See* DX–41 art. IX, art. XIII; *see also* Tr. at 1025:04–1028:06.) In another case against the Hospital related to this same investigation, the Hon. William H. Pauley recently denied the plaintiffs' request to remand the action back to state court on the ground that the CBA governs overtime assignments. *See Cera v. The N.Y. & Presbyterian Hosp.*, No. 17 Civ. 3163, Dkt. No. 28 (S.D.N.Y. Sept. 8, 2017).

However, the Hospital has pointed to nothing in the CBA that governs the provision of training opportunities or that would permit the Hospital to subject Plaintiffs to a hostile work environment.

The cases cited by the Hospital are not persuasive. In *Morrissey v. Verizon Commc'ns Inc.*, No. 10 Civ. 6115, 2011 WL 2671742, at *5 (S.D.N.Y. July 7, 2011), the court held that the plaintiff's age-discrimination claims were preempted by the LMRA because the central allegation in his complaint was that his employer fired him "in violation of its contractual 'obligat[ion] to lay off technicians according to seniority' ...." *Accord Romero v. DHL Express, Inc.*, No. 12 Civ. 1942, 2015 WL 1315191, at *6 (S.D.N.Y. Mar, 24, 2015) ("Plaintiff[ ] ... alleges that, by creating a hostile work environment, and by subjecting him to discrimination, retaliation, and wrongful termination, [the employer] breached its contract with him, The only contract mentioned in Plaintiff's Complaint is the CBA ...."). That is obviously distinguishable from this case, where Plaintiffs did not argue that the Hospital's failure to train them violated the CBA or some seniority system, but was instead an effort to discriminate against them based on their age.

486

.The other case that the Hospital cites, *Domnister v. Exclusive Ambulette, Inc.*, 607 F.3d 84, 90 (2d Cir. 2010), is even less helpful to its cause. In that case, the Second Circuit held that the complaint was *not* preempted by the LMRA, in large part because it did "not rely upon or address (or even mention) any collective-bargaining agreement." That is true here as well; the amended complaint makes absolutely no mention of the CBA, Plaintiffs' rights under it, or any issue of seniority. (*See* Am. Compl., Dkt. No. 12.)

As the Hospital has pointed to no provision of the CBA that requires interpretation in order to adjudicate Plaintiffs' claims of denial of training and hostile work environment, the Hospital's motion for judgment as a matter of law as to those claims is DENIED.

**B. The Hospital Is Not Entitled to Judgment as a Matter of Law or a New Trial on the Hostile Work Environment Claim Under City Law**

The Hospital seeks vacatur of the verdict (under NYCHRL only) that it created a hostile work environment on the basis of age, asserting that the evidence presented by Plaintiffs failed to rise above the level of petty slights and trivial inconveniences, and thus it is entitled to judgment as a matter of law or a new trial. That aspect of the motion is denied.

In support if its application, the Hospital cites to the places in the record where Okeke and Mahmoud testified that Mand and her supervisor Irene Lutinger made age-neutral comments about the older technologists, including that Mand called Plaintiffs "incompetent" and that Lutinger wanted to put a "new face" on the lab. However, this ignores the testimony of other witnesses, including non-Plaintiff Cera, who testified that Mand regularly

questioned why the older technologists were still employed by the Hospital (Tr. at 221:18–222:16.), and Baglione, who testified that Mand explicitly called Plaintiffs "too old" for their jobs. (Tr. at 495:08–19.) These comments were not age-neutral. Although the comments were not physically threatening or particularly severe, multiple witnesses testified that they were made on a regular basis, not just on a few occasions. Baglione, for example, said he avoided Mand because the frequent comments made him feel "humiliate[d]." (Tr. at 495:13–17.)

It is indisputable that the evidence of a hostile work environment in this case is "thin," as the Court noted on the record to the parties at the close of Plaintiffs' case. (Tr. at 702:13.) That is why the Court dismissed the parallel federal-law hostile work environment claims. However, under NYCHRL, a plaintiff only needs to show that he was treated "less well" on account of his age to demonstrate a hostile work environment. There is no requirement that the conduct be either severe or pervasive, as is required under federal law. There was testimony from nearly every Plaintiff that they were regularly told that they were "too old" to be working there, too old to be trained on new technology, "incompetent," "slow," and "lazy." (*See* Tr. at 269:19–22; Tr. at 446:19–23; Tr. at 495:08–19; Tr. at 628:05–24.) This is more than sufficient under the lenient NYCHRL to sustain the jury's verdicts. When coupled with evidence that Plaintiffs were denied training opportunities based on their age, it is unsurprising that the jury found in Plaintiffs' favor.

Those verdicts are also not against the weight of the evidence. I can easily understand why the jury might not credit Mand's testimony that she did not make the remarks attributed to her. Therefore,

the Hospital is not entitled to a new trial on these claims.

## IV. Damages

Because the Court has granted the Hospital's motion for a new trial on Plaintiffs' termination claims under NYCHRL, the damages award must be vacated and the issue of damages retried as well. The awards of back pay obviously must be vacated, since back pay relates directly to the claims of discriminatory termination. The awards of damages for emotional distress must also be vacated because the jury did not distinguish between emotional distress resulting from the Plaintiffs' termination and that resulting from their denial of training or from having to work in a hostile work environment. At the retrial, the jury will be told that the Hospital has been found liable on the hostile work environment and denial of training claims and that their sole responsibility in connection therewith is to fix damages in connection with those claims. Obviously, in order to prove those damages, Plaintiffs will have to testify about these matters.

The Hospital's motion for remittitur is, accordingly, DENIED as moot.

Plaintiffs' motion for attorney's fees (Dkt. No. 217), is DENIED without prejudice to renewal after retrial.

### Conclusion

For the foregoing reasons, the Hospital's motion for judgment as a matter of law is DENIED; the motion for a new trial is GRANTED IN PART AND DENIED IN PART; the motion for remittitur is DENIED as moot. Plaintiffs' motion for attorney's fees is DENIED.

The Clerk of the Court is directed to remove Dkt. Nos. 217 and 222 from the Court's list of pending motions, vacate the judgment, and to reopen the case.